# BETH ISRAEL HOSPITAL *v.* NATIONAL LABOR RELATIONS BOARD

No. 77–152.   Argued April 24, 1978—Decided June 22, 1978

484

BRENNAN, J., delivered the opinion of the Court, in which STEWART, WHITE, MARSHALL, and STEVENS, JJ., joined. BLACKMUN, J., *post*, p. 508, and POWELL, J., *post*, p. 509, filed opinions concurring in the judgment, in which BURGER, C. J. and REHNQUIST, J., joined.

*Louis Chandler* argued the cause for petitioner. With him on the brief was *Robert Chandler*.

*Norton J. Come* argued the cause for respondent. With him on the brief were *Solicitor General McCree, John S. Irving*, and *Carl L. Taylor*.

*Laurence Gold* argued the cause for intervenor Massachusetts Hospital Workers' Union Local 880, Service Employees' International Union. With him on the brief were *Lester Asher, J. Albert Woll*, and *George Kaufmann*.*

MR. JUSTICE BRENNAN delivered the opinion of the Court.

The National Labor Relations Act, 49 Stat. 449, as amended, 61 Stat. 136, 29 U. S. C. §§ 151 to 168, was further amended in 1974 to extend its coverage and protection to employees of nonprofit health-care institutions.[1] Act of July 26, 1974, Pub. L. No. 93–360, 88 Stat. 395. Petitioner is a Boston nonprofit hospital whose employees are covered by the amended Act. This case presents the question whether the Court of Appeals for the First Circuit erred in ordering

---

*Richard Dorn* filed a brief for the National Union of Hospital and Health Care Employees, RWDSU, AFL–CIO, as *amicus curiae* urging affirmance.

[1] Coverage was achieved by deleting from the definition of "employer" in § 2 (2) of the Act, 29 U. S. C. § 152 (2), the provision that an employer shall not include "any corporation or association operating a hospital, if no part of the net earnings inures to the benefit of any private shareholder or individual . . . ." Act of June 23, 1947, ch. 120, 61 Stat. 136.

enforcement of that part of an order of the National Labor Relations Board based on the Board's finding that petitioner, in violation of §§ 8 (a)(1) and (3), 29 U. S. C. §§ 158 (a)(1) and (3), interfered with its employees' rights guaranteed by § 7 of the Act, 29 U. S. C. § 157, by issuing and enforcing a rule that prohibits employees from soliciting union support and distributing union literature during nonworking time in the hospital cafeteria and coffeeshop used primarily by employees but also used by patients and visitors.

In 1970, prior to the advent of any union organizational activity at the hospital, petitioner announced a rule barring solicitation and distribution of literature in any area to which patients or visitors have access. Petitioner permitted these activities only in certain employee locker rooms and certain adjacent restrooms. App. 59. In July 1974, however, as a result of a proceeding instituted against it before the Massachusetts Labor Relations Commission, petitioner announced a rule permitting solicitation in the cafeteria on a one-to-one basis while maintaining the total ban on distribution. *Id.*, at 67. On March 6, 1975, shortly after the NLRB acquired jurisdiction, petitioner reinstated its previous rule limiting employee solicitation and distribution to certain employee locker rooms and restrooms. *Id.*, at 70.[2] That rule provides:

> "There is to be no soliciting of the general public (patients, visitors) on Hospital property. Soliciting and the distribution of literature to B. I. employees may be done by other B. I. employees, when neither individual is on his or her working time, in employee-only areas— employee locker rooms and certain adjacent rest rooms. Elsewhere within the Hospital, including patient-care and

---

[2] The July 1974 rule was in effect at the time the complaint was filed. Prior to the hearing before the Administrative Law Judge, however, the Board amended its complaint to encompass the March 6, 1975, policy which prohibited all solicitation and distribution in the cafeteria.

all other work areas, and areas open to the public such as lobbies, cafeteria and coffee shop, corridors, elevators, gift shop, etc., there is to be no solicitation nor distribution of literature.

"Solicitation or distribution of literature on Hospital property by non-employees is expressly prohibited at all times.

"Consistent with our long-standing practices, the annual appeal campaigns of the United Fund and of the Combined Jewish Philanthropies for voluntary charitable gifts will continue to be carried out by the Hospital." *Id.,* at 70–71.

Upon a charge filed by the union,[3] the Board issued a complaint and the matter was tried before an Administrative Law Judge. The Board affirmed the rulings, findings, and conclusions of the Administrative Law Judge that petitioner's issuance and maintenance of the rules violated § 8 (a)(1) and the disciplining of an employee for an infraction of them violated § 8 (a)(3). 223 N. L. R. B. 1193 (1976). The Administrative Law Judge found that there were few places in which employees' § 7 rights effectively could be exercised, that petitioner had not offered any convincing evidence that the rule was necessary to prevent disruptions in patient care, and that, on balance, the rule was an unjustified infringement of § 7 rights. See 223 N. L. R. B., at 1198. The Board issued an order, paragraph 1 of which broadly required petitioner to cease and desist from interfering with "concerted union activities" and "exercise of [employees'] rights guaranteed in Section 7 of the Act," and paragraph 2 (b) of which required petitioner to "[r]escind its written rule prohibiting distribution of union literature and union solicitation in its cafeteria

---

[3] The charges leading to the complaint were filed by Massachusetts Hospital Workers' Union, Local 880, Service Employees International Union, AFL–CIO.

and coffeeshop." 223 N. L. R. B., at 1199, as modified, *id.*, at 1193.

The Court of Appeals accepted as settled law that rules restricting employee solicitation during nonworking time, and distribution during nonworking time in nonworking areas are presumptively invalid in the absence of special circumstances to justify them, 554 F. 2d 477, 480 (1977), and held that, since "[i]n this case, the application of the employer's no-solicitation, no-distribution rules to the cafeteria and coffee shop banned concerted activities in non-working areas during non-working time . . . [t]he burden, therefore, was on the hospital to show that special circumstances justified its curtailment of protected activities in these two places." *Ibid.* After review of the record, the court held that "the Board did not err in finding that the hospital had not justified its no-solicitation, no-distribution rule as it related to the cafeteria and coffee shop." *Id.*, at 481. The court refused to enforce paragraph 1 of the Board's order, however, on the ground that no proclivity to violate the Act had been shown to support that broad cease-and-desist order. It also enforced paragraph 2 (b) only after adding to the order the clarifying words "that part of" so that petitioner was required to "[r]escind *that part of* its written rule prohibiting distribution [of union literature and union solicitation in its cafeteria and coffeeshop]," *id.*, at 482 (emphasis in original), to make clear that the validity of the rules as applied to areas outside the cafeteria and coffeeshop remained open. The Board has not sought review of the Court of Appeals' rulings in these respects.[4] The narrow question for decision, therefore, is whether the Court of Appeals erred in enforcing the Board's order requiring petitioner to rescind the rules as applied to the hospital's eating

---

[4] Petitioner's application of the rules to other areas not devoted to immediate patient care has since been litigated before the Board in another case. *Beth Israel Hospital,* 228 N. L. R. B. 1495, 95 LRRM 1087 (1977).

facilities. Because of a suggested conflict among Courts of Appeals as to the validity of restrictions upon solicitation and distribution in patient-access areas of the hospital, such as petitioner's cafeteria and coffeeshop, we granted certiorari.[5] 434 U. S. 1033 (1978). We affirm.

I

Although petitioner employs approximately 2,200 regular employees,[6] only a fraction of them have access to many of the areas in which solicitation is permitted. Solicitation and distribution are not permitted in all locker areas. Rather, of the total number of locker areas only six separate and scattered locker areas containing 613 lockers are accessible to all employees for these purposes.[7] Moreover, most of these rooms are divided and restricted on the basis of sex, and in any event

---

[5] The Court of Appeals in this case, and the Court of Appeals for the Seventh Circuit, *Lutheran Hosp.* v. *NLRB,* 564 F. 2d 208 (1977), cert. pending, No. 77–1289, have enforced Board orders protecting solicitation and distribution in cafeterias and coffeeshops. In *Lutheran Hospital,* the order enforced extended beyond cafeterias to all areas other than "immediate patient care areas." The Court of Appeals for the Tenth Circuit, *St. John's Hospital & School of Nursing, Inc.* v. *NLRB,* 557 F. 2d 1368 (1977), together with the Courts of Appeals for the District of Columbia and Sixth Circuits, have denied enforcement to similar Board orders applicable to cafeterias as well as to other patient-access areas. *Baylor Univ. Medical Center* v. *NLRB,* 188 U. S. App. D. C. 109, 578 F. 2d 351 (1978); *NLRB* v. *Baptist Hospital, Inc.,* 576 F. 2d 107 (CA6 1978).

[6] This number is exclusive of house staff, attending physicians, students, and employees of Harvard University who work at the hospital. App. 28.

[7] There are four categories of locker rooms. The first, in which there are a total of 613 lockers, are areas in which any employee may engage in solicitation and distribution. The second, in which there are a total of 470 lockers, are areas in which, for security reasons, only the employees to whom the lockers have been assigned have access. The other two categories which comprise the remainder of the hospital's lockers are off limits to solicitation and distribution because they are located in working areas or in areas in which patients or the general public have access. 223 N. L. R. B. 1193, 1197 (1976); App. 127–134.

are not generally used even by petitioner to communicate messages to employees. The cafeteria,[8] on the other hand, is a common gathering room for employees. A 3-day survey conducted by petitioner revealed that 77% of the cafeteria's patrons were employees while only 9% were visitors and 1.56% patients. The cafeteria is also equipped with vending machines used by employees for snacks during coffeebreaks and other nonworking time.

Petitioner itself has recognized that the cafeteria is a natural gathering place for employees on nonworking time, for it has used and permitted use of the cafeteria for solicitation and distribution to employees for purposes other than union activity. For example, petitioner maintains an official bulletin board in the cafeteria for communicating certain messages to employees. On occasion it has set up special tables in or near the cafeteria entrance to aid solicitation of contributions for the United Way or United Fund charities, the Jewish Philanthropies Organization Drive, the Israel Emergency Fund, and to recruit members for the credit union. When petitioner embarked upon an intensive cost-reduction program, styled "Save a Buck a Day" or "BAD," it used the cafeteria to post banners and distribute informational literature touting the program to employees, and, significantly, generally did not use the locker rooms and restrooms for this purpose. In addition to these official uses, petitioner maintains an unofficial bulletin board in the cafeteria for the employees' use, a rack and small table which display commercial literature, such as travel brochures, and information of interest only to employees, such as carpool openings.

"[T]here are relatively few places where employees can congregate or meet on hospital grounds or in the nearby vicinity for the purpose of discussing nonwork related matters other than in the cafeteria; secondly, the area in the neighbor-

---

[8] During the pendency of this litigation, the coffeeshop was dismantled, and the space added to the cafeteria.

hood of the hospital is congested and provides no ready access to employees"; 223 N. L. R. B., at 1198 (opinion of Administrative Law Judge). Petitioner, moreover, has adopted the policy of refusing to make available to unions the names and addresses of employees unless ordered to do so by the Board. App. 33. Petitioner has also made antiunion statements in a newsletter distributed to employees with their paychecks at their work stations.

On October 25, 1974, Ann Schunior, a medical technician in the Department of Medicine, was distributing the union newsletter As We See It by circulating from table to table. She approached only persons she thought were employees, and if not sure of their employee status, inquired whether they were, explaining that she was distributing literature for employees. Petitioner's general director witnessed this activity, advised Schunior that she was violating the hospital's no-distribution rule, and demanded that she cease the distribution. A written warning notice was issued to Schunior the same day advising that she had been in flagrant violation of the hospital's rules and that further violations would result in dismissal. 223 N. L. R. B., at 1195–1196. The publication As We See It was objectionable to petitioner because certain issues were said to contain remarks which disparaged the hospital's ability to provide adequate patient care, primarily because of understaffing. *Id.*, at 1196.

## II

### A

We have long accepted the Board's view that the right of employees to self-organize and bargain collectively established by § 7 of the NLRA, 29 U. S. C. § 157, necessarily encompasses the right effectively to communicate with one another regarding self-organization at the jobsite.[9] *Republic Aviation*

---

[9] We recently reiterated this principle in *Central Hardware Co. v. NLRB,* 407 U. S. 539 (1972):

"[Section 7] organization rights are not viable in a vacuum; their

*Corp.* v. *NLRB,* 324 U. S. 793 (1945), articulated the broad
legal principle which must govern the Board's enforcement
of this right in the myriad factual situations in which it is
sought to be exercised:

> "[The Board must adjust] the undisputed right of
> self-organization assured to employees under the Wagner
> Act and the equally undisputed right of employers to
> maintain discipline in their establishments. Like so many
> others, these rights are not unlimited in the sense that
> they can be exercised without regard to any duty which
> the existence of rights in others may place upon employer
> or employee." *Id.,* at 797–798.

That principle was further developed in *NLRB* v. *Babcock &
Wilcox Co.,* 351 U. S. 105 (1956), where the Court stated:

> "Accommodation between [employee-organization rights
> and employer-property rights] must be obtained with as
> little destruction of one as is consistent with the main-
> tenance of the other." *Id.,* at 112.

Based on its experience in enforcing the Act, the Board
developed legal rules applying the principle of accommodation.
The effect of these rules is to make particular restrictions on
employee solicitation and distribution presumptively lawful or
unlawful under § 8 (a)(1) subject to the introduction of
evidence sufficient to overcome the presumption. Thus, the
Board has held that restrictions on employee solicitation dur-
ing nonworking time, and on distribution during nonworking
time in nonworking areas, are violative of § 8 (a)(1) unless
the employer justifies them by a showing of special circum-

---

effectiveness depends in some measure on the ability of employees to learn
the advantages and disadvantages of organization from others. Early in
the history of the administration of the Act the Board recognized the
importance of freedom of communication to the free exercise of organiza-
tion rights." *Id.,* at 542–543 (citation omitted).

stances which make the rule necessary to maintain production or discipline.[10]    In the case of retail marketing establishments, including public restaurants, however, the Board has held that solicitation and distribution may be prohibited on the selling floor at all times.[11]

*Republic Aviation Corp., supra*, sustained the Board's general approach to adjudication of § 8 (a)(1) charges.   There we held that the Board is free to adopt, in light of its experience, a rule that, absent special circumstances, a particular employer restriction is presumptively an unreasonable interference with § 7 rights constituting an unfair labor practice under § 8 (a)(1), without the necessity of proving the underlying generic facts which persuaded it to reach that conclusion. The validity of such a rule "[l]ike a statutory presumption or one established by regulation, . . . perhaps in varying degree, depends upon the rationality between what is proved and what is inferred."  *Republic Aviation, supra*, at 804–805 (footnote omitted).   The Board here relied on, and petitioner challenges, the fashioning of a similar presumption applicable to hospitals.

---

[10] The Board's solicitation rule was first announced in *Peyton Packing Co.*, 49 N. L. R. B. 828, 843 (1943). The Board's decision in *LeTourneau Co. of Ga.*, 54 N. L. R. B. 1253 (1944), which applied the presumption to a no-distribution rule enforced against employee organizers distributing literature in the employer's parking lot, was affirmed with *Republic Aviation Corp.* v. *NLRB*, 324 U. S. 793 (1945), without separate discussion.   In *Stoddard Quirk Mfg. Co.*, 138 N. L. R. B. 615 (1962), however, the Board established the distinction between distribution and solicitation, limiting the presumption as applicable to distribution only in nonworking areas. For purposes of that rule, the Board considers the distribution of signature cards to be solicitation and not distribution.  See *id.*, at 620 n. 6.

[11] See *Marriott Corp. (Children's Inn)*, 223 N. L. R. B. 978 (1976); *Bankers Club, Inc.*, 218 N. L. R. B. 22 (1975); *McDonald's Corp.*, 205 N. L. R. B. 404 (1973); *Marshall Field & Co.*, 98 N. L. R. B. 88 (1952), enf'd, 200 F. 2d 375 (CA7 1953); *Goldblatt Bros., Inc.*, 77 N. L. R. B. 1262 (1948); *May Dept. Stores Co.*, 59 N. L. R. B. 976 (1944), enf'd as modified, 154 F. 2d 533 (CA8 1946).

B

Although, prior to the 1974 amendments, the Board had considered the validity of no-solicitation and no-distribution rules in the context of proprietary hospitals, no clear rule emerged from its decisions. In *Summit Nursing & Convalescent Home, Inc.*, 196 N. L. R. B. 769 (1972), enf. denied, 472 F. 2d 1380 (CA6 1973), a divided panel, reversing the Administrative Law Judge, held unlawful a rule prohibiting solicitation or distribution "at any time in the patient or public area within the [nursing] home, or in the nurses' stations." Another divided panel, in *Guyan Valley Hospital, Inc.*, 198 N. L. R. B. 107 (1972), affirming the Trial Examiner, held lawful a rule prohibiting "soliciting in working areas during working hours." In *Guyan Valley* the Trial Examiner noted that the employer's rule did not interfere with "solicitation . . . in the waiting room, the employees' dining room, and the parking lot." *Id.*, at 111. The Board apparently relied upon this fact to distinguish it from *Summit Nursing, supra.* See 198 N. L. R. B., at 107 n. 2. Finally, in *Bellaire General Hospital*, 203 N. L. R. B. 1105 (1973), the panel which had split in *Summit Nursing*, unanimously held unlawful a rule prohibiting solicitation and distribution "by employees while off duty or during working hours." 203 N. L. R. B., at 1108.

This series of somewhat inconclusive decisions was the background against which, after the 1974 amendments, the full Board considered development of a rule establishing the permissible reach of employer rules prohibiting solicitation and distribution in all health-care institutions. In a unanimous opinion, in *St. John's Hospital & School of Nursing, Inc.*, 222 N. L. R. B. 1150 (1976), the Board concluded that the special characteristics of hospitals justify a rule different from that which the Board generally applies to other employers. On the basis of evidence and aided by the briefs *amici curiae* filed by the American Hospital Association and District 1199

of the National Union of Hospital and Health Care Employees, the Board found:

> "that the primary function of a hospital is patient care and that a tranquil atmosphere is essential to the carrying out of that function. In order to provide this atmosphere, hospitals may be justified in imposing somewhat more stringent prohibitions on solicitation than are generally permitted. *For example,* a hospital may be warranted in prohibiting solicitation even on nonworking time in strictly patient care areas, such as the patients' rooms, operating rooms, and places where patients receive treatment, such as x-ray and therapy areas. Solicitation at any time in those areas might be unsettling to the patients—particularly those who are seriously ill and thus need quiet and peace of mind." *Ibid.* (emphasis added).

The Board concluded that prohibiting solicitation in such situations was justified and required striking the balance against employees' interests in organizational activity. The Board determined, however, that the balance should be struck against the prohibition in areas other than immediate patient-care areas such as lounges and cafeterias absent a showing that disruption to patient care would necessarily result if solicitation and distribution were permitted in those areas. The Board concluded, on a record devoid of evidence which contradicted that assessment, that the possibility of disruption to patient care in those areas must be deemed remote.

### III

Petitioner challenges the qualified extension of the rule affirmed in *Republic Aviation* to hospitals on several grounds: First, it argues that the Board's decision conflicts with the congressional policy evinced in the 1974 hospital amendments that the "self-organizational activities of health care employees not be allowed to 'disrupt the continuity of patient care.'" Brief for Petitioner 10. Second, it argues that the basis for

that rule, the principle of limited judicial review of agency action, is inapposite here because the Board is acting outside of its area of expertise. Third, it argues that the Board's decision is unsupported by evidence and is irrational. Finally, it argues that it is irrational to distinguish between the non-employee-access cafeteria involved here and the public-access restaurants in which the Board has upheld solicitation bans.

A

Contrary to petitioner's assertion, nothing in the legislative history of the 1974 amendments indicates a congressional policy inconsistent with the Board's general approach to enforcement of § 7 self-organizational rights in the hospital context. First, there is no reason to believe, as petitioner asserts, that Congress intended either to prohibit solicitation entirely in the health-care industry or to limit it to the extent the Board had required at the time the 1974 amendments were enacted. In extending coverage of the Act to nonprofit hospitals, Congress enacted special provisions for strike notice and mediation, applicable solely to the health-care industry, intended to avoid disruptions of patient care caused by strikes.[12]

---

[12] Section 1 (b) of the 1974 Act, 88 Stat. 395, amended § 2 of the NLRA by adding a definition of "health care institution" to which the special provisions would be applicable. Section 1 (d), 88 Stat. 396, amended the notice provisions of § 8 (d) of the NLRA by requiring, with respect to health-care institutions, 90-day notice of termination or expiration of a contract, 60-day notice to the Federal Mediation and Conciliation Service (FMCS) of contract termination or expiration, and 30-day notice to FMCS with respect to initial contract negotiation disputes arising after recognition, and by requiring that the health-care institution and the labor organization participate in mediation at the direction of the FMCS. Section 1 (e), 88 Stat. 396, added a new § 8 (g) to the NLRA, requiring labor organizations to give a 10-day written notice to the health-care institution and to FMCS before engaging in picketing, strikes, or other concerted refusals to work. Section 2 of the 1974 Act added a new § 213 to the Labor Management Relations Act, 1947, 29 U. S. C. § 183 (1970 ed., Supp. V), which authorizes upon certain conditions the constitution of a

It is significant that, although, as indicated, *supra,* at 494, at the time the 1974 amendments were enacted, the Board had spoken with neither clarity nor one voice on the issue, Congress did not enact any special provision regarding solicitation and distribution in particular or disruption of patient care in general other than through strikes. We can only infer, therefore, that Congress was satisfied to rely on the Board to continue to exercise the responsibility to strike the appropriate balance between the interests of hospital employees, patients, and employers.

Second, nothing in the legislative history supports petitioner's argument that the particular approach to enforcement of § 7 rights in the hospital context adopted by the Board is inconsistent with congressional policy. The elimination of the nonprofit-hospital exemption reflected Congress' judgment that hospital care would be improved by extending the protection of the Act to nonprofit health-care employees.[13] Congress found that wages were low and working conditions poor in the health-care industry, and that as a result, employee morale was low and employment turnover high.[14] Congress deter-

---

Special Board of Inquiry to investigate and report concerning the labor dispute. For a more detailed explanation of these provisions, see Vernon, Labor Relations in the Health Care Field under the 1974 Amendments to the National Labor Relations Act, 70 Nw. U. L. Rev. 202 (1975).

[13] See *Id.,* at 203–204.

[14] See, *e. g.,* the remarks of Senator Cranston, the floor manager of the bill:

"During the last 2½ years, hospital wage increases have lagged far behind those received by workers in other industries. . . .

"Today, hospital workers are still notoriously underpaid. . . .

"The long hours worked and the small monetary reward received by hospital workers result in a constant turnover with a consequent threat to the maintenance of an adequate standard of medical care. This was emphasized over and over again by many of the witnesses. Turnover rates for employees in several hospitals that were studied were reported by witnesses to be as high as 1,200 to 1,500 [percent] a year.

"Mr. President, both management and union witnesses reported lower

mined that the extension of organizational and collective-bargaining rights would ameliorate these conditions and elevate the standard of patient care.[15] Congress also found that "the exemption . . . had resulted in numerous instances of recognition strikes and picketing. Coverage under the Act should completely eliminate the need for such activity, since the procedures of the Act will be available to resolve organizational and recognition disputes." S. Rep. No. 93–766, p. 3 (1974).

It is true, as petitioner argues, that Congress felt that "the needs of patients in health care institutions required special consideration in the Act . . . ," *ibid.,* and that among the witnesses before the Committee on Labor and Public Welfare, "[t]here was a recognized concern for the need to avoid disruption of patient care wherever possible." *Id.,* at 6. But these statements do not support petitioner's further contention that congressional policy establishes that the very fact that hospitals are involved justifies, without more, a restrictive no-solicitation rule the validity of which must be sustained unless the Board proves that patient care will not be disrupted. To begin with, the congressional statements quoted, when placed in context, offer no support for such an argument.[16]

---

turnover after unionization than before. . . . [T]he turnover rates at the two hospitals which had been 1,200 to 1,500 percent a year before unionization dropped to 24 to 30 percent a year after unionization. Indeed it has been convincingly argued that when hospital employees are unionized . . . the result is better job stability and security than is possible without such collective bargaining arrangements. This will also mean a better job done in terms of the quality of patient care provided.

"Mr. President, I urge all those who want improved health care and increased stability for labor-management relations in health care institutions to support this bill." 120 Cong. Rec. 12936–12938 (1974).

[15] See *ibid.; id.,* at 16899–16900 (remarks of Rep. Thompson).

[16] The statements in full are as follows:

"In the Committee's deliberations on this measure, it was recognized that the needs of patients in health care institutions required special consideration in the Act including a provision requiring hospitals to have

Moreover, Congress addressed its concern for the unique problems presented by labor disputes in the health-care industry by adding specific strike-notice and mediation provisions designed to avert interruption in the delivery of critical health-care services; none expresses a policy in favor of curtailing self-organizational rights.[17] Indeed, although Congress recognized that strikes could cause complete disruption of patient care and enacted provisions designed to forestall them, it apparently felt that extension of the right to strike was sufficiently important to fulfillment of its goals to permit strikes despite that result. If Congress was willing to countenance the total, albeit temporary, disruption of patient care caused by strikes in order to achieve harmonious employer-employee relations and long-term improved health care, we cannot say it necessarily regarded appropriately regulated solicitation and distribution in areas such as the cafeteria as undesirable without evidence of a substantial threat of harm to patients. In light of Congress' express finding that improvements in health care would result from the right to organize, and that unionism is necessary to overcome the poor working conditions

---

sufficient notice of any strike or picketing to allow for appropriate arrangements to be made for the continuance of patient care in the event of a work stoppage." S. Rep. No. 93–766, p. 3 (1974).

"PRIORITY CASE HANDLING

"Many of the witnesses before the Committee, including both employee and employer witnesses, stressed the uniqueness of health care institutions. There was a recognized concern for the need to avoid disruption of patient care wherever possible.

"It was this sensitivity to the need for continuity of patient care that led the Committee to adopt amendments with regard to notice requirements and other procedures related to potential strikes and picketing.

.         .         .         .         .

"Because of the need for continuity of patient care, the Committee expects the NLRB to give special attention and priority to all charges of employer, employee and labor organization unfair practices involving health care institutions consistent with [existing priorities]." Id., at 6–7.

[17] See n. 12, supra.

retarding the delivery of quality health care, we therefore cannot say that the Board's policy—which requires that absent such a showing solicitation and distribution be permitted in the hospital except in areas where patient care is likely to be disrupted—is an impermissible construction of the Act's policies as applied to the health-care industry by the 1974 amendments. Even if the legislative history arguably pointed toward a contrary view, the Board's construction of the statute's policies would be entitled to considerable deference. *NLRB* v. *Iron Workers,* 434 U. S. 335, 350 (1978); *NLRB* v. *Weingarten, Inc.,* 420 U. S. 251, 266–267 (1975).

B

Petitioner disputes the applicability of the principle of limited judicial review of Board action generally and of the principle announced in *Republic Aviation,* regarding the Board's authority to fashion generalized rules in light of its experience, in particular, to the Board's decision involving hospitals. Arguing that the Board's conclusion regarding the likelihood of disruption to patient care which solicitation in a patient-access cafeteria would produce is essentially a medical judgment outside of the Board's area of expertise, it contends that the Board's decision is not entitled to deference. Rather, since it, not the Board, is responsible for establishing hospital policies to ensure the well-being of its patients, the Board may not set aside such a policy without specifically disproving the hospital's judgment that solicitation and distribution in the cafeteria would disrupt patient care. Brief for Petitioner 18. We think that this argument fundamentally misconceives the institutional role of the Board.

It is the Board on which Congress conferred the authority to develop and apply fundamental national labor policy. Because it is to the Board that Congress entrusted the task of "applying the Act's general prohibitory language in the light of the infinite combinations of events which might be charged

as violative of its terms," *Republic Aviation,* 324 U. S., at 798, that body, if it is to accomplish the task which Congress set for it, necessarily must have authority to formulate rules to fill the interstices of the broad statutory provisions. It is true that the Board is not expert in the delivery of health-care services, but neither is it in pharmacology, chemical manufacturing, lumbering, shipping, or any of a host of varied and specialized business enterprises over which the Act confers jurisdiction. But the Board is expert in federal national labor relations policy, and it is in the Board, not petitioner, that the 1974 amendments vested responsibility for developing that policy in the health-care industry. It is not surprising or unnatural that petitioner's assessment of the need for a particular practice might overcompensate its goals, and give too little weight to employee organizational interests. Here, as in many other contexts of labor policy, "[t]he ultimate problem is the balancing of the conflicting legitimate interests. The function of striking that balance to effectuate national labor policy is often a difficult and delicate responsibility, which the Congress committed primarily to the National Labor Relations Board, subject to limited judicial review." *NLRB* v. *Truck Drivers,* 353 U. S. 87, 96 (1957). The judicial role is narrow: The rule which the Board adopts is judicially reviewable for consistency with the Act, and for rationality, but if it satisfies those criteria, the Board's application of the rule, if supported by substantial evidence on the record as a whole, must be enforced.[18] *NLRB* v. *Erie Resistor Corp.,* 373 U. S. 221, 235–236 (1963); *Phelps Dodge Corp.* v. *NLRB,* 313 U. S. 177, 194 (1941).

## C

Petitioner's contention that the Board's decision is unsupported by evidence and irrational is without merit. Not-

---

[18] See § 10 (e), NLRA, 29 U. S. C. § 160 (e); Administrative Procedure Act, 5 U. S. C. § 706 (2) (E) (1976 ed.); *Universal Camera Corp.* v. *NLRB,* 340 U. S. 474 (1951).

withstanding petitioner's challenge, the Board's conclusion that "the possibility of any disruption in patient care resulting from solicitation or distribution of literature is remote," *St. John's Hospital & School of Nursing, Inc.*, 222 N. L. R. B., at 1151, as applied to petitioner's cafeteria, is fully supported by the record. The Board had before it evidence that patients' meals are provided in their rooms. A patient is not allowed to visit the cafeteria unless his doctor certifies that he is well enough to do so. Thus, patient use of the cafeteria is voluntary, random, and infrequent. It is of critical significance that only 1.56% of the cafeteria's patrons are patients. Patients who frequent the cafeteria would not expect to receive special attention or primary care there and any unusually sensitive to seeing union literature distributed or overhearing discussions about unionism, readily could avoid the cafeteria without interfering with the hospital's program of care. Especially telling is the fact that petitioner, under compulsion of the Massachusetts Labor Commission, permitted limited union solicitation in the cafeteria for a significant period, apparently without untoward effects, and that petitioner, who logically is in the best position to offer evidence on the point, was unable to introduce *any* evidence to show that solicitation or distribution was or would be harmful.[19]

There was also cogent evidence that petitioner itself recognized that at least some solicitation and distribution would not upset patients and undermine its function of providing quality medical care. It thus appears that petitioner's rule was more restrictive than necessary to avert that result.[20]

---

[19] Cf. *International Harvester Co.* v. *Ruckelshaus,* 155 U. S. App. D. C. 411, 439, 478 F. 2d 615, 643 (1973).

[20] Evidence that petitioner adopted a less restrictive approach to behavior in the cafeteria which would be at least as disquieting to patients as union solicitation further supports the Board's conclusion that the risk of harm to patients is not so great as to justify an unlimited restriction. Petitioner advised its professional staff of complaints voiced by patients and visitors

Petitioner had permitted use of the cafeteria for other types of solicitation, including fund drives, which, if not to be equated with union solicitation in terms of potential for generating controversy, at least indicates that the hospital regarded the cafeteria as sufficiently commodious to admit solicitation and distribution without disruption.[21] While in other contexts, it has been recognized that organizational activity can result in behavior which, as petitioner argues and we agree, would be undesirable in the hospital's cafeteria,[22] the Board has not foreclosed the hospital from imposing less restrictive means of regulating organizational activity more nearly directed toward the harm to be avoided.[23]

---

based on overheard clinical discussions about named patients in such places as the cafeteria line. Petitioner warned that the "effect [of this on patients] can be devastating . . . ," App. 136, and that "[p]atients and visitors [have been] horrified to overhear—in . . . cafeteria lines . . .— what is to the engrossed clinician innocuous professional discussion." *Id.*, at 138. This kind of discussion, far more unsettling than talk of wages and working conditions, was not banned from the cafeteria; rather, petitioner merely required staff to "restrict the voicing of your clinical discussions to include none other than your intended audience." *Ibid.*

[21] Compare *Goldblatt Bros., Inc.*, 77 N. L. R. B. 1262 (1948), in which, explaining its decision to uphold a ban on solicitation in a department store restaurant, the Board noted:

"[I]n some of the stores the restaurant consists of a counter, in which restaurant employees on duty, other employees off duty, union organizers, and customers are in close contact with each other. Under these circumstances, union solicitation in the restaurants is as apt to disrupt the Respondent's business as is such solicitation carried on in any other portion of the store in which customers are present." *Id.*, at 1263–1264.

[22] See, *e. g.*, *McDonald's Corp.*, 205 N. L. R. B., at 407 n. 18 (opinion of Administrative Law Judge) ("Some solicitation might result in a pleasant and informative chat between the employees on their nonwork time in working areas. On the other hand, it might lead to a bitter exchange of insults or worse . . .").

[23] For example, a rule forbidding any distribution to or solicitation of nonemployees would do much to prevent potentially upsetting literature from being read by patients. Petitioner, in fact, has such a rule, see *supra*,

The Board was, of course, free to draw an inference from these facts in light of its experience, the validity of which "depends upon the rationality between what is proved and what is inferred."[24] *Republic Aviation*, 324 U. S., at 805 (footnote omitted). It cannot fairly be said that the inference drawn by the Board regarding the likelihood of disruption of patient care in light of this evidence was irrational.

Similarly, it is the Board upon whom the duty falls in the first instance to determine the relative strength of the conflicting interests and to balance their weight. As the Court noted in *Hudgens* v. *NLRB*, 424 U. S. 507, 522 (1976), "[t]he locus of [the] accommodation [between the legitimate interests of both] may fall at differing points along the spectrum depending on the nature and strength of the respective § 7 rights and private property rights asserted in any given context." Here, the employees' interests are at their strongest,

---

at 486–487, and it has not been shown that organizational activity by Schunior or anyone else actually resulted in distribution to nonemployees. This rule could be readily enforced at petitioner's hospital, moreover, since employees are required to wear name tags—and many do—and since security guards monitor the cafeteria. Secondly, the Board may determine that a rule requiring face-to-face distribution rather than leaving literature on a table accessible to all is a justified accommodation of § 7 rights with petitioner's legitimate desire to avoid having potentially upsetting literature read by patients.

[24] The requirement that decisions be supported by evidence on the record "does not go beyond the necessity for the production of evidential facts, however, and compel evidence as to the results which may flow from such facts. . . . An administrative agency with power after hearings to determine on the evidence in adversary proceedings whether violations of statutory commands have occurred may infer within the limits of the inquiry from the proven facts such conclusions as reasonably may be based upon the facts proven. One of the purposes which lead to the creation of such boards is to have decisions based upon evidential facts under the particular statute made by experienced officials with an adequate appreciation of the complexities of the subject which is entrusted to their administration." *Republic Aviation*, 324 U. S., at 800. (Citations omitted.)

for unlike the interests involved in *NLRB* v. *Babcock & Wilcox Co.*, 351 U. S., at 113, "[the] activity was carried on by employees already rightfully on the employer's property." *Hudgens*, 424 U. S., at 521–522, n. 10. "[T]he employer's management interests rather than his property interests [are] involved. . . . This difference is 'one of substance.'" *Ibid.* (citations omitted).

On the other hand, in the context of health-care facilities, the importance of the employer's interest in protecting patients from disturbance cannot be gainsaid. While outside of the health-care context, the availability of alternative means of communication is not, with respect to employee organizational activity, a necessary inquiry, see *Babcock & Wilcox, supra,* at 112–113, it may be that the importance of the employer's interest here demands use of a more finely calibrated scale. For example, the availability of one part of a health-care facility for organizational activity might be regarded as a factor required to be considered in evaluating the permissibility of restrictions in other areas of the same facility. That consideration is inapposite here, however, where the only areas in which organizational rights are permitted is not conducive to their exercise. Moreover, the area in which organizational rights are sought here is a "natural gathering are[a]" for employees, 554 F. 2d, at 481, and one in which the risk of harm to patients is relatively low as compared to potential alternative locations within the facility. On the basis of the record before it, we cannot say that the Board, in evaluating the relative strength of the competing interests, failed to consider any factor appropriately to be taken into account. Cf. *Babcock & Wilcox, supra.*

## D

Petitioner's argument that it is irrational to hold, as the Board has, on the one hand, that a rule prohibiting solicitation in the dining area of a public restaurant is lawful because

solicitation has the tendency to upset patrons,[25] while one prohibiting like activity in a hospital's cafeteria is unlawful absent evidence that nonemployee patrons would be upset, on the other, has only superficial appeal. That argument wholly fails to consider that the Board concluded that these rules struck the appropriate *balance* between organizational and employer rights in the particular industry to which each is applicable. In the retail marketing and restaurant industries, the primary purpose of the operation is to serve customers, and this is done on the selling floor of a store or in the dining area of a restaurant. Employee solicitation in these areas, if disruptive, necessarily would directly and substantially interfere with the employer's business. On the other hand, it would be an unusual store or restaurant which did not have stockrooms, kitchens, and other nonpublic areas, and in those areas employee solicitation of nonworking employees must be permitted. In that context, the Board concluded that, on balance, employees' organizational interests do not outweigh the employer's interests in prohibiting solicitation on the selling floor.

In the hospital context the situation is quite different. The main function of the hospital is patient care and therapy and those functions are largely performed in areas such as operating rooms, patients' rooms, and patients' lounges. The Board does not prohibit rules forbidding organizational activity in these areas. On the other hand, a hospital cafeteria, 77% of whose patrons are employees, and which is a natural gathering place for employees, functions more as an employee-service area than a patient-care area. While it is true that the fact of access by visitors and patients renders the analogy to areas such as stockrooms in retail operations less than complete, it cannot be said that when the primary function and use of the cafeteria, the availability of alternative areas of the facility in which § 7 rights effectively could be exercised, and

---

[25] See cases cited n. 11, *supra*.

the remoteness of interference with patient care are considered, it was irrational to strike the balance in favor of § 7 rights in the hospital cafeteria and against them in public restaurants. The Board's explanation of the consistent principle underlying the different results in each situation cannot fairly be challenged. *St. John's Hospital & School of Nursing, Inc.*, 222 N. L. R. B., at 1150–1151, n. 3.

## IV

In summary, we reject as without merit petitioner's contention that, in enacting the 1974 health-care amendments, Congress intended the Board to apply different principles regarding no-solicitation and no-distribution rules to hospitals because of their patient-care functions. We therefore hold that the Board's general approach of requiring health-care facilities to permit employee solicitation and distribution during nonworking time in nonworking areas, where the facility has not justified the prohibitions as necessary to avoid disruption of health-care operations or disturbance of patients, is consistent with the Act. We hold further that, with respect to the application of that principle to petitioner's cafeteria, the Board was appropriately sensitive to the importance of petitioner's interest in maintaining a tranquil environment for patients. Insofar as petitioner's challenge is to the substantiality of the evidence supporting the Board's conclusions, this Court's review is, of course, limited. "Whether on the record as a whole there is substantial evidence to support agency findings is a question which Congress has placed in the keeping of the Courts of Appeals. This Court will intervene only in what ought to be the rare instance when the standard appears to have been misapprehended or grossly misapplied." *Universal Camera Corp.* v. *NLRB,* 340 U. S. 474, 491 (1951). We cannot say that the Court of Appeals' assessment of the record either "misapprehended" or "grossly misapplied" that standard. The Court of Appeals did note, however, that the

Board's guidelines are still in flux and are far from self-defining, concluding, and we agree:

> "[T]he Board [bears] a heavy continuing responsibility to review its policies concerning organizational activities in various parts of hospitals. Hospitals carry on a public function of the utmost seriousness and importance. They give rise to unique considerations that do not apply in the industrial settings with which the Board is more familiar. The Board should stand ready to revise its rulings if future experience demonstrates that the well-being of patients is in fact jeopardized." 554 F. 2d, at 481.

The authority of the Board to modify its construction of the Act in light of its cumulative experience is, of course, clear. *NLRB* v. *Iron Workers,* 434 U. S., at 351; *NLRB* v. *Weingarten, Inc.,* 420 U. S., at 265–267.

*Affirmed.*

MR. JUSTICE BLACKMUN, with whom THE CHIEF JUSTICE and MR. JUSTICE REHNQUIST join, concurring in the judgment.

I concur only in the result the Court reaches here, for I, too, agree with much that MR. JUSTICE POWELL says in his separate opinion.

There is, of course, a certain irony when the Board grants protection from solicitation to the retail store and to the Burger Chef and the Hot Shoppe cafeteria, but at the same time denies it to the hospital restaurant facility where far more than mere commercial interests are at stake. Patients and their concerned families are not to be treated as impersonal categories or classes. They are individuals with problems that ought not be subject to aggravation. Nevertheless, on this record, as the Court's opinion reveals, it would have been difficult for the Board to reach a different result, when it utilized, questionably in my view, the rule of *Republic Aviation Corp.* v. *NLRB,* 324 U. S. 793 (1945), even as perhaps modified for application in the hospital setting.

The tenor of the Court's opinion and of the Board's approach concerns me. There are many hospital coffeeshops and cafeterias that are primarily patient and patient-relative oriented, despite the presence of employee patrons, far more so than this very restricted Beth Israel operation, that seems akin to a manufacturing plant's emloyees' cafeteria. I fear that this unusual case will be deemed to be an example for all hospital eating-facility cases, and that the Board and the courts now will go further down the open-solicitation road than they would have done, had a more usual hospital case been the one first to come here. Hospitals, after all, are not factories or mines or assembly plants. They are hospitals, where human ailments are treated, where patients and relatives alike often are under emotional strain and worry, where pleasing and comforting patients are principal facets of the day's activity, and where the patient and his family—irrespective of whether that patient and that family are labor or management oriented—need a restful, uncluttered, relaxing, and helpful atmosphere, rather than one remindful of the tensions of the marketplace in addition to the tensions of the sickbed.

I entertain distinct doubts about whether the Board, in its preoccupation with labor-management problems, has properly sensed and appreciated the true hospital operation and its atmosphere and the institution's purpose and needs. I earnestly share the caveat pronounced by the Court of Appeals, and reproduced by the Court in the next-to-the-last paragraph of its opinion, *ante,* at 508, and I sincerely hope that the Board bears that heavy responsibility in mind when it considers other hospital cases that come before it for decision.

MR. JUSTICE POWELL, with whom THE CHIEF JUSTICE and MR. JUSTICE REHNQUIST join, concurring in the judgment.

In *Republic Aviation Corp.* v. *NLRB,* 324 U. S. 793 (1945), this Court approved the reasoning of the National Labor Relations Board in *Peyton Packing Co.,* 49 N. L. R. B. 828

(1943), enf'd, 142 F. 2d 1009 (CA5), cert. denied, 323 U. S. 730 (1944), and the balance it struck in adjusting the respective rights of industrial employers and employees. The Court also endorsed the Board's formulation: Because working time is for work, a rule prohibiting union solicitation during working time " 'must be presumed to be valid in the absence of evidence that it was adopted for a discriminatory purpose' "; but during nonworking time, when an employee's time is his own even though he is on company property, a rule prohibiting union solicitation " 'must be presumed to be an unreasonable impediment to self-organization and therefore discriminatory in the absence of evidence that special circumstances make the rule necessary in order to maintain production or discipline.' " 324 U. S., at 803–804, n. 10 (quoting *Peyton Packing Co., supra,* at 843–844).

The *Republic Aviation* rule is inapplicable in the instant case, which arises from a setting entirely different from the one in which the rule was formulated. I concur in the judgment of the Court, however, because I regard the Board's decision as based on substantial evidence even without the assistance of the *Republic Aviation* presumption.

## I

The rule of *Republic Aviation* was adopted in the context of labor relations in industrial and manufacturing plants, where third parties unconnected with labor or management generally are not involved. In such a setting, it is relatively simple to divide the work environment into the two spheres defined in *Peyton Packing.* During working time an employer's prohibition of solicitation and distribution may be presumed valid, because "[w]orking time is for work"; but during nonworking time or in nonworking areas, such rules are presumptively invalid. The latter part of the Board's set of presumptions reflects the reasonable inference, based on the Board's experience with the actual facts of industrial life, that

such employers ordinarily will not have legitimate reasons to restrict employees' activities on their own time, even if on company property. In sustaining the Board's presumption, this Court recounted its development and said:

"We perceive no error in the Board's adoption of this presumption. The Board had previously considered similar rules in industrial establishments and the definitive form which the *Peyton Packing Company* decision gave to the presumption was the product of the Board's appraisal of *normal conditions about industrial establishments*. Like a statutory presumption or one established by regulation, the validity, perhaps in a varying degree, depends upon the rationality between what is proved and what is inferred." 324 U. S., at 804–805 (footnotes omitted; emphasis supplied).

The rationality found to exist in *Republic Aviation,* and therefore the validity of the presumption, cannot be transferred automatically to other workplaces, for to do so would sever the connection between the inference and the underlying proof. The Court's approval of the *Republic Aviation* rule was based explicitly on the Board's considered appraisal of "normal conditions about industrial establishments." [1] Conditions in industrial or manufacturing plants differ substantially from conditions in sales and service establishments where employees and members of the public mingle.

When confronted with the problem of retail-establishment rules prohibiting solicitation and distribution, the Board wisely refrained from mechanically applying the *Republic Aviation* rule when its justification was absent. The Board recognized that in the setting of a retail establishment, an employer well

---

[1] Even the formulation of the "special circumstances" rule is stated in terms of the specific environment of an industrial plant, speaking of circumstances making a restriction on employee activity " 'necessary in order to maintain production or discipline.' " 324 U. S., at 803–804, n. 10.

might have legitimate reasons for prohibiting solicitation and distribution on the selling floor and in other areas where customers are likely to be present.[2]   In the retail-store cases, the Board weighed the respective interests of the employer and the employees and concluded that the employer's rule was reasonable in view of the extent of the public's presence on the premises, the relationship between the public and the employees, and the fact that the employer's main business, consisting of direct selling to customers, would be disrupted. The same conclusion was reached with respect to a public restaurant on the premises of a retail store when on-duty and off-duty employees were "in close contact with each other" and with customers, on the theory that under such circumstances, union solicitation would be "as apt to disrupt the [employer's] business as . . . solicitation carried on in any other portion of the store in which customers are present." *Goldblatt Bros., Inc.*, 77 N. L. R. B. 1262, 1264 (1948).   See also *McDonald's Corp.*, 205 N. L. R. B. 404, 408 (1973).[3]

---

[2] See *Marriott Corp. (Children's Inn)*, 223 N. L. R. B. 978 (1976); *Bankers Club, Inc.*, 218 N. L. R. B. 22 (1975); *McDonald's Corp.*, 205 N. L. R. B. 404 (1973); *Marshall Field & Co.*, 98 N. L. R. B. 88 (1952), enf'd, 200 F. 2d 375 (CA7 1953); *Goldblatt Bros., Inc.*, 77 N. L. R. B. 1262 (1948); *May Dept. Stores Co.*, 59 N. L. R. B. 976 (1944), enf'd as modified, 154 F. 2d 533 (CA8), cert. denied, 329 U. S. 725 (1946).

[3] The Board's retail-establishment cases might be interpreted as instances in which the Board concluded that the *Republic Aviation* presumption had been rebutted by the employer's proof of "special circumstances." The special circumstances would be created by the "presence [of customers] and the likelihood of their being exposed to union activities." *Bankers Club, Inc., supra*, at 27.   But even if this were the correct formulation— that the *Republic Aviation* presumption applies to retail establishments but is rebutted by proof of the presence of members of the public in areas where solicitation takes place—that test would be satisfied in all retail-establishment cases as well as in the instant case.   The result would be the same as if the presumption did not apply at all.   After special circumstances had been shown, the Board then would have to determine the proper balance between employees' rights and the employer's interests.

In my view, the presence of patients and members of the public in the hospital cafeteria removes the case from the framework established in *Republic Aviation,* just as the presence of customers has that effect in the Board's retail-establishment cases. The hospital's function in serving patients, their families, and visitors is much like the retail establishment's function in serving its customers. That a nonprofit hospital does not share the profit motive of a retail establishment does not diminish the hospital employer's professional concern for the welfare of those in its care, including not only patients but also their friends and relatives who come to visit.

It is true that the hospital's primary function is carried out in the immediate patient-care areas, just as the retail establishment's main function is carried out on the selling floor. But the Board has applied its retail-store rules to public restaurants on the premises of the retail store, see *supra,* at 512, notwithstanding the fact that the primary selling function does not take place there. Public restaurants in retail stores are provided for some of the reasons that hospitals maintain public eating places—including the convenience of the establishment's patrons. In addition, a hospital's more general purpose extends to, and pervades, all areas of the hospital to which the public has access; it is not limited narrowly to the provision of technical medical treatment.[4] Part of the hospital's func-

---

[4] Thus, while the Board has distinguished between selling and certain nonselling areas of department stores, and has applied the presumption of invalidity to no-solicitation rules in some nonselling public areas, see *Marshall Field & Co., supra,* at 92–93, a similar line may not be drawn so easily between patient-care and nonpatient-care areas of a hospital. As the Court of Appeals for the Tenth Circuit observed in denying enforcement to the Board's attempt to divide the areas of a hospital, "the ultimate factual inferences on which the Board's distinction [is] based were drawn not from the record evidence but rather from the Board's own perceptions of modern hospital care and the physical, mental, and emotional conditions of hospital patients—areas outside the Board's acknowledged field of expertise in labor/management relations." *St. John's Hospital & School of Nursing, Inc.* v. *NLRB,* 557 F. 2d 1368, 1373 (1977).

tion is to provide a "total environment . . . where the medical needs of patients are served by maintaining a climate free of strife and controversy." *NLRB* v. *Baptist Hospital, Inc.*, 576 F. 2d 107, 110 (CA6 1978). In this respect, the Board should take greater account of the impact of solicitation in this sensitive area than it does with respect to retail establishments. A presumption developed in and geared to the context of industrial establishments, which the Board has declined to apply to retail stores, simply has no relevance to hospitals.

## II

The Board contends that it has effected a proper accommodation of the competing interests in *St. John's Hospital & School of Nursing, Inc.*, 222 N. L. R. B. 1150 (1976), enf. granted in part and denied in part, 557 F. 2d 1368 (CA10 1977), in which it applied the basic rule of *Republic Aviation* but found "sufficient justification" for curtailment of employee rights in certain areas of the hospital.[5] Acknowledging that the "primary function of a hospital is patient care and that a tranquil atmosphere is essential to the carrying out of that function," the Board concluded in *St. John's* that "hospitals may be justified in imposing somewhat more stringent prohibitions on solicitation than are generally permitted." Accordingly, a hospital might prohibit solicitation in "strictly patient care areas," such as "patients' rooms, operating rooms, and places where patients receive treatment"; but not in other areas of the hospital, even those to which patients and visitors have access. 222 N. L. R. B., at 1150–1151.

In my view, the Board's "accommodation" of the competing interests in *St. John's* fails to give appropriate weight to the unique characteristics of a hospital. It amounts to no

---

[5] Both the parties and the court in *St. John's* started from the premise that the *Republic Aviation* rule applied. The Court of Appeals disagreed, however, with the Board's assessment that special circumstances justified the hospital's restriction only in "immediate" patient-care areas.

more than an application of the *Republic Aviation* rule to certain areas of a hospital but not others, despite the fact that members of the public are present and potentially affected even in areas of a hospital not characterized as "strictly patient care" areas. I believe that the Tenth Circuit was correct in refusing to accord the *St. John's* presumption the kind of deference that was accorded the *Republic Aviation* presumption when applied in the industrial setting. I would hold that the potential impact on patients and visitors of union solicitation and distribution of literature in hospitals requires the Board to make a far more sensitive inquiry into the actual circumstances of each case.

Once the Board is deprived of the presumption of invalidity of an employer's rule, it must establish by substantial evidence on the record as a whole that the employer has violated §§ 8 (a)(1) and 8 (a)(3). On the facts of this case, I would hold that the Board has carried its burden.

The Board must reach an accommodation between the respective rights of employer and employees "with as little destruction of one as is consistent with the maintenance of the other." *NLRB* v. *Babcock & Wilcox Co.*, 351 U. S. 105, 112 (1956); see *Eastex, Inc.* v. *NLRB, post,* p. 556; *Hudgens* v. *NLRB,* 424 U. S. 507, 521–523 (1976); *Central Hardware Co.* v. *NLRB,* 407 U. S. 539, 542–545 (1972). "The locus of that accommodation, however, may fall at differing points along the spectrum depending on the nature and strength of the respective § 7 rights and [the employer's] rights asserted in any given context." *Hudgens, supra,* at 522. In this case, the employer's asserted concern is with the welfare of patients and their visitors, a particularly weighty "management" interest. In accommodating the interests of employer and employees in a hospital case, the Board must recognize the employer's responsibility for the welfare of patients and other third parties present in the hospital.[6]

---

[6] This, of course, is consistent with Congress' concern, in enacting the

Yet in view of the facts in this case, which either are stipulated or largely undisputed, I think the Board has met its burden by substantial evidence. As found by the Administrative Law Judge, use of the hospital cafeteria by employees is substantial (77%), while use by patients is negligible (1.56%) and use by the general public is relatively low (under 10%). The cafeteria is predominantly the employees' facility, and there hardly is any other area of the hospital in which employees may communicate with each other while at the hospital. The parties stipulated that the only areas where employees can gather are the locker areas and restrooms, and only 613 of the 2,200 employees' lockers are accessible to all employees.[7]

In addition to the unavailability of other convenient places for employee communication, cf. *Babcock & Wilcox, supra,* at 112–113, the facts show that the hospital cafeteria is used by both the employer and employees for a variety of commercial and noncommercial notices and solicitations. And while the hospital was concerned about the disruptive effect on patients of employees' conversations about the medical progress of particular patients, it implemented only a precatory rule, not an outright prohibition of all such conversations in the cafeteria. See *ante,* at 502–503, n. 20.

The hospital failed to introduce any evidence of a reasonable possibility of harmful consequences to patients or visitors.

---

1974 health-care amendments, "for the need to avoid disruption of patient care wherever possible." S. Rep. No. 93–766, p. 6 (1974).

[7] The Administrative Law Judge also found that the urban location of the hospital and the widely dispersed residences of hospital employees make communication outside the hospital difficult. In addition, petitioner would not provide the union with a list of employees' names and addresses. "The place of work is a place uniquely appropriate for dissemination of views concerning the bargaining representative and the various options open to the employees," *NLRB* v. *Magnavox Co.,* 415 U. S. 322, 325 (1974); see *Eastex, Inc.* v. *NLRB, post,* at 574, and the hospital cafeteria was the most appropriate place for such communication on the facts of this case.

It relied primarily on arguments with respect to hospitals in general. No testimony was introduced that the practice at Beth Israel is to seek early rehabilitation of patients by encouraging them to leave their rooms at the earliest time compatible with their condition, and to move about the hospital. The further weakness in petitioner's case is that it introduced no medical testimony that related such practices and needs to its cafeteria.[8] Putting it differently, the undisputed evidence portrays this cafeteria as being one essentially operated for employees as their primary gathering place, and as almost wholly unrelated to patient care.

In sum, I view this case as essentially barren of the type of evidence that could be produced on behalf of many hospitals when confronted with a similar problem. See, *e. g.*, *NLRB* v. *Baptist Hospital, Inc.,* 576 F. 2d 107 (CA6 1978). My concurrence in the judgment is based entirely on the facts, as I disagree—for the reasons above stated—with the rationale of the Board, its reliance upon a wholly inappropriate presumption, and its unrealistic distinction between hospital and retail-store cafeterias. I also note that the Court emphasizes the facts of this case, and the "critical significance [of the fact] that only 1.56% of the cafeteria's patrons are patients." *Ante,* at 502.[9]

---

[8] Rather, the employer rested on the allegedly inflammatory nature of a union newsletter distributed by one employee, without introducing any evidence that the newsletter had fallen or would fall into the hands of patients or visitors. Furthermore, proof of such a probability would not be relevant to the no-*solicitation* portion of the hospital's rule. The hospital allowed one-to-one solicitation in the cafeteria until after the initiation of these proceedings; yet petitioner was "unable to show any instance of injury to patients" while that more permissive rule was in effect. 223 N. L. R. B. 1193, 1197 (1976).

[9] Moreover, the Court's opinion expresses no view as to the validity of prohibiting employee solicitation or distribution in other areas of a hospital which may not be devoted "strictly" or "immediately" to patient care but to which patients and visitors have access. This question was not presented in this case.