ROBERT P. SMITH, Jr., Judge.
The trustees of Okaloosa-Walton Junior College appeal, and Okaloosa-Walton Higher Education Association (OWHEA), an employee organization, cross-appeals from a final PERC order which sustains two counts of PERC’s complaint on OWHEA’s charge of unfair labor practices practiced by the College, and rejects OWHEA’s contest of the election by which the faculty, voting 41 to 27, declined OWHEA’s representation. The substantive issues are whether the College overly restricted its faculty employees in their pro-union solicitation of and distribution of literature to other faculty employees; whether the College unlawfully discriminated against the labor organization by denying it access to meeting space in Room E-043 in the Learning Resources Building, and denying it postage-free use of the internal campus mail boxes maintained for faculty, while granting such access to other organizations not indigenous to the campus; and whether, if PERC was correct in sustaining either charge, PERC erred in not invalidating the election.
In attacking PERC’s findings of unfair labor practices and the remedial measures PERC ordered, the College also raises procedural objections of some moment: that PERC’s complaint of an unfair labor practice, issued after investigation of OWHEA’s charges, was untimely, Section 447.-503(4)(d); and that “the fairness of the proceedings or the correctness of the ac *1380 tion” [1] was impaired by PERC’s quashing of a subpoena duces tecum served on the union president, returnable before the hearing officer, or by the adversary participation of PERC’s acting general counsel in the unfair labor practice proceedings, or by PERC’s delay of its final order for eleven months after the hearing officer’s recommended order was filed.
The faculty election in September 1975 concluded a year of organizational efforts by OWHEA, and resistance by the trustees and administration, which began even before the Public Employees Relations Act became effective on January 1, 1975. Chapter 74-100, Section 9, Laws of Florida. OWHEA’s unfair labor practice charge, limited in subject to OWHEA’s right of access and in time to College conduct since April 1, 1975, was filed by its lawyer on July 24, 1975.[2] Following its defeat at the polls in September OWHEA timely moved to upset the election on more generalized access grounds and for other reasons no longer pertinent. In November 1975, PERC’s acting general counsel issued an unfair labor practice complaint against the College, charging both that the College “discrimina-torily denied” OWHEA access to meeting rooms and the internal mail system and (expanding OWHEA’s charge) that the College, continuously since November 19, 1974, unlawfully restricted its employees on campus in soliciting union interest among fellow employees and in distributing organizational material to them: [3]
Commencing on or about November 19, 1974, and continuing all times thereafter, the Respondent [College] through its agent, Dr. J. E. McCracken, promulgated solicitation and distribution guidelines for all solicitations and distributions on the Campus of Okaloosa-Walton Junior College. Commencing on or about November 19, 1974, and continuing all times thereafter, solicitations on the Campus of Okaloosa-Walton Junior College have been restricted between 7:30 a. m. and 10:30 p. m. to specific dining areas during the scheduled lunch hour of any given Okaloosa-Walton Junior College employee.
Because PERC’s unfair labor practice complaint and OWHEA’s election challenge similarly charged access discrimination affecting OWHEA, and both turned on disputed factual issues, PERC consolidated the proceedings and elected to refer them to the Division of Administrative Hearings of the Department of Administration. Section 120.57(l)(a). In the ensuing proceedings OWHEA’s cause was advanced both by its separately retained counsel and, over the College’s objection, by PERC’s acting general counsel.
The final hearing concluded on January 27, 1976, and on July 29 hearing officer Pfeiffer issued a comprehensive recommended order, Section 120.57(l)(b)8, recommending that the unfair labor practice charges be dismissed as unfounded and that OWHEA’s election protest be rejected. On June 29, 1977, PERC entered its final order, sustaining both unfair labor practice charges, and ordering remedial measures, *1381 but rejecting OWHEA’s election protest. These appeals followed.

The solicitation/distribution issue

PERC’s order finding that the College committed unfair labor practices by unduly restricting solicitation and distribution in support of OWHEA’s organizational effort is foundéd on PERA’s Section 447.501(l)(a), by which public employers are prohibited from:
(a) Interfering with, restraining, or coercing public employees in the exercise of any rights guaranteed them under this part.
PERA does not in terms specify the extent of employees’ rights to solicit or to distribute literature to one another in support of organization. PERC’s definition of those rights is found in two sources: the reverse implications of Section 447.509, prohibiting employee solicitation at certain times and distribution at certain times and places; and in NLRB and federal court decisions construing similar provisions of the National Labor Relations Act. Section 447.509(1) provides:
(1) Employee organizations, their members, agents, or representatives, or any persons acting in their behalf are hereby prohibited from:
(a) Soliciting public employees during working hours of any employee who is involved in the solicitation.
(b) Distributing literature during working hours in areas where the actual work of public employees is performed, such as offices, warehouses, schools, police stations, fire stations, and any similar public installations. This section shall not be construed to prohibit the distribution of literature during the employee’s lunch hour or in such areas not specifically devoted to the performance of the employee’s official duties.

We previously have noted “the interplay between the applicable provisions of PERA, the APA and the National Labor Relations Act (NLRA).” Pasco County School Board v. PERC, 353 So.2d 108, 116 (Fla. 1st DCA 1977). We have approved PERC’s reference to NLRA decisions for guidance of its own, and we ourselves have resorted to them as persuasive authority. E. g., Pasco County, 353 So.2d at 116; Jess Parrish Memorial Hospital v. PERC, 364 So.2d 777 (Fla. 1st DCA 1978). And withal we have recognized that
[it is] PERC’s responsibility to define and implement public employees’ substantive rights under PERA, and we are forbidden by § 120.68(12) from substituting our judgment for that of the agency on an issue of discretion. Board of Regents v. PERC, 368 So.2d 641, 643 (Fla. 1st DCA 1979).
Implementing PERA in the light of the body of federal NLRA precedent to which PERC continually refers, PERC has in this case ordered, in respect to solicitation by one public employee of another on the working premises:
To effect the policies and purposes of the Act, the right of employees to solicit on an employer’s premises must be allowed subject only to the restriction that it not be on the working hours of either the solicitor or the prospective member.
PERC’s statement in respect to employee solicitation of other employees for organizational purposes is consonant both with Section 447.509(l)(a) and federal decisions on the same subject. No restriction may lawfully be placed on the right of one employee to discuss organizational interests with another on site, on the nonworking time of both, unless by reason of some extraordinary circumstances the restriction is necessary for order and discipline in pursuit of the employer’s institutional purposes: here, the educational purposes of the College. The right of employees “to self-organize and bargain collectively . necessarily encompasses the right effectively to communicate with one another regarding self-organization at the jobsite.” Beth Israel Hospital v. NLRB, 437 U.S. 483, 491, *1382 98 S.Ct. 2463, 2469, 57 L.Ed.2d 370, 380 (1978); NLRB v. Babcock & Wilcox Co., 351 U.S. 105, 76 S.Ct. 679, 100 L.Ed. 975 (1956); Republic Aviation Corp. v. NLRB, 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372 (1945).
The order before us recognizes the distinction, found both in Section 447.509(1) and in NLRA decisions, between solicitation and distribution. Oral discussion and solicitation between employees on the jobsite is to be permitted except “during working hours of any employee who is involved in the solicitation.” Section 447.509(l)(a). The distribution of organizational literature, however, is subject both to the working hours restriction applicable to solicitation, because distribution is a form of solicitation, and to the further restriction that it not take place “where the actual work of public employees is performed, such as offices . . .,” nor in other areas “specifically devoted to the performance of the employee’s official duties.” Section 447.-509(l)(b); Stoddard-Quirk Mfg. Co., et al., 138 N.L.R.B. 615 (1962); Beth Israel, 437 U.S. at 493, 98 S.Ct. at 2469, 57 L.Ed.2d at 381, n. 10.[4] Thus PERC’s order in this case declares:
[Bjecause distribution of literature poses different problems [than solicitation] both from the standpoint of employees and management organizational rights in that regard require that employees have access to non-working areas for distribution during non-working hours. See, Stoddard-Quirk Mfg. Co., 138 NLRB 615, 51 LRMM 1110 (1962).
In Stoddard-Quirk, applying the Babcock & Wilcox doctrine that competing interests in employer discipline and employee organization “must be [maintained] with as little destruction of one as is consistent with the maintenance of the other,” [5] the NLRB held that oral solicitation by employees cannot be confined to particular places because in fact it “impinges upon the employer’s interests only to the extent that it occurs on working time . . . .” 138 N.L.R.B. at 619. By contrast, the distribution of literature may reasonably be further restricted because it impinges employee interests by the threat of littering- — a matter of salting the sea on many college campuses, one would suppose — and, more importantly, because distribution can be effective, and therefore less compelling as against competing employer management interests, as well in limited locations as everywhere on the employer’s premises:
The distinguishing characteristic of literature ... is that its message is of a permanent nature and that it is designed to be retained by the recipient for reading or re-reading at his convenience. Hence, the purpose is satisfied so long as it is received. [138 N.L.R.B. at 620]
In the light of those principles we examine the facts as found by the DOAH hearing officer, and as found by PERC in its order finding the College guilty of unfair labor practices in respect to solicitation/distribution restrictions.
On November 7, 1974, the College president met with the Faculty Council, four of whose five members were members also of OWHEA, and considered guidelines for solicitation and distribution in the organizational activities anticipated after January 1, 1975, when PERA would become effective. From that meeting came the president’s memorandum of November 19, on which PERC’s unfair labor practice complaint was predicated. The memorandum stated:
The Faculty Council and the President of the College were in full consensus in affirming the following specifics relative to solicitations on the campus:
1. College personnel are not to be subjected to solicitation by any groups or persons on-campus between 7:30 a. m. *1383 and 10:30 p. m., except in the following specified dining areas and during the scheduled lunch hour of any given employee. .

3. On-campus distribution of any literature and notices which are not official College business shall be by placement on or in the square counters in the front lobby of the Administration Building.
4. Posters and notices of interest to personnel of the College shall be placed in the covered main bulletin board in the front lobby of the Administration Building. . . .
The president’s memorandum was presented to the faculty on November 19 and, the hearing officer found, no objection was expressed by any person present:
If members of the Faculty Council opposed the guidelines, their opposition crystallized after the November 9 Council meeting, and was not openly expressed at the November 19 faculty meeting. There may not have been a full consensus in support of the guidelines among members of the Faculty Council as expressed in the body of the solicitation guidelines; however, President McCracken was justified in believing that there was such a consensus since no opposition was expressed.
The pace of OWHEA’s organizational effort quickened after January 1975. Its request for voluntary recognition by the College was made and denied in February. In March OWHEA petitioned PERC for recognition as the faculty’s bargaining representative. On May 1 the College and OWHEA agreed to the election, and the first complaint was made of the November 17 solicitation/distribution guidelines. On June 2, 1975, the College president distributed a faculty memorandum significantly easing those restrictions. The later memorandum stated concerning solicitation:
College personnel are not to be subjected to solicitation by any groups or persons on campus for any purpose when any person involved in the solicitation is on “working time” .
“Working time” was defined as
that time when an employee has any scheduled obligations, whether instructional or non-instructional, to perform with respect to his position at the College including but not limited to all such obligations as required office hours, committee work, conferences, and official meetings.
The June 1975 memorandum stated, with respect to distribution:
On campus distribution of any literature or notices which are not official College business shall not take place during working time, nor shall it take place in areas where actual work of public employees is normally performed.
The hearing officer found that, between November 1974 and June 1975, the November solicitation/distribution guidelines were not “literally followed” by OWHEA nor enforced by the administration:
Many solicitations occurred outside of the designated areas during the proscribed hours, and several occurred during times when the person being solicited was actually on duty. The President of OWJC had reason to believe that the guidelines were being violated, but no effort to enforce them was ever initiated.
The guidelines prohibited certain activities which the OWHEA considered desirable; however, the OWHEA was able to engage in a wide variety of campaign activities, and an even wider variety of activities that were available were not utilized. During the campaign members of the OWHEA spoke freely in support of the organization to non-members in the hallways, in the lunchroom, in the parking lot, and in faculty offices. The OWHEA distributed numerous bulletins, newsletters, and assorted memoran-da to persons in the prospective bargaining unit. Material was delivered through the mails directly to OWJC, where it was placed in the faculty mailboxes; was delivered through the mails to the residences of faculty members; and was *1384 placed at a distribution point in close proximity to the mailboxes so that it could be read by any interested person. . The total volume of materials distributed by the OWHEA through these avenues exceeded materials distributed by the [College administration]. OW-HEA members personally contacted many persons within the prospective bargaining unit. Many of the authorization cards which were forwarded by the OW-HEA to the Public Employees Relations Commission with the representation certification petition were signed on campus as a result of such direct communications.
As a result of these intermediate findings the hearing officer recommended an order that the College did not commit an unfair labor practice in respect to solicitation/distribution restrictions, because:
1. The June 1975 memorandum on solicitation and distribution restrictions was fully in accord with Section 447.509(1) and federal NLRA decisions, prohibiting solicitation by employees of employees only on working time, and prohibiting distribution by employees to employees in working places during working time.
2. The November 1974 memorandum on solicitation and distribution was on its face “overly restrictive, and [its] promulgation, maintenance and enforcement could serve as the basis for an unfair labor practice charge.” But insofar as the “promulgation” of that memorandum — as distinguished from its “maintenance and enforcement” — was the basis for the unfair labor practice charge, the charge made July 24, 1975, was untimely and PERC’s subsequent complaint violated Section 447.503(4)(d), which forbids any PERC complaint on a charge filed more than six months after the occurrence complained of; [6] and because (b) the restrictions promulgated by the November 1974 memorandum were not enforced, did not inhibit employee solicitation on campus leading to “the requisite showing of interest for filing the representation certification petition,” and were not objected to by OWHEA or any affected employee until the scheduled date of the certification hearing, May 1, 1975, following which “the amended guidelines quickly ensued.” The hearing officer concluded:
Under NLRB practice, an unfair labor practice would not be found if an illegal solicitation rule had not been enforced, and was corrected. NLRB v. Shawnee Industries, Inc., 333 F.2d 221 (10th Cir. 1964); NLRB v. Elias Brothers Big Boy, Inc., 325 F.2d 360 (6th Cir. 1963).
In rejecting the hearing officer’s proposed order in this respect, PERC stated in its order:
While recent decisions indicate that the existence of an invalid solicitation/distribution rule will not necessarily result in the finding of an unfair labor practice if it is clarified or revised immediately after its issuance, the facts of the instant case do not warrant the application of that principle; for the record herein reveals that the [College administration’s] rule was not clarified for at least six months after it went into effect. See, Tri-County Medical Center, 222 NLRB 174, 91 LRRM 1323 (1976). Moreover, the mere maintenance of an overly restrictive solicitation/distribution rule serves to inhibit employees engaging in otherwise protected organizational activity. Hence, the finding of a violation is not precluded by the absence of specific evidence that the rule was enforced as of any particular date against any particular employee. See, Farah Manufacturing Co., 187 NLRB 83, 76 LRRM 1100 (1970). [N]or does the subsequent modification of an invalid rule preclude the entry of an order stating that no similar rule may be maintained or enforced in the future.
While we entirely credit PERC’s stated policy regarding solicitation/distribution rights of employees, we find no substantial *1385 evidence in this record supporting PERC’s determination that the College administration committed an unfair labor practice and must now be required, as PERC would have it, to post a notice saying “IT HAS BEEN DETERMINED THAT WE HAVE VIOLATED THE LAW” and that “We will. NOT maintain or enforce a solicitation/distribution rule that prohibits solicitation during non-working time or that prohibits distribution during non-working hours and in non-work areas.” The claimed unfair labor practice cannot lie in the administration’s promulgation of the November 1974 guidelines, for that occurred even before PERA became effective, and more than six months before OWHEA filed its charge, not mentioning solicitation/distribution restrictions,[7] which PERC added to its ensuing complaint. Section 447.503(4)(d), Florida Statutes (1977), supra fn. 6. Contrast NLRB v. Computed Time Corp., 587 F.2d 790 (5th Cir. 1979).
Promulgation of the November 1974 guidelines therefore cannot serve to tar the College; so maintenance and enforcement of them must, those being the activities forsworn by the remedial notice prepared by PERC. Concerning that, as the hearing officer in effect found, there simply was no substantial evidence that the College administration maintained and enforced strictures against employee solicitation of other employees on nonworking time. Such employee anxiety as there was in discussing organizational issues at the College was attributable to the difficulty of distinguishing working from nonworking time for college faculty[8] — a distinction fairly drawn by the administration’s June 2, 1975, clarifying memorandum — and everyone’s doubt of what may constitute “solicitation” as distinguished from passing conversation on current events. Since PERC’s order does nothing to remedy that confusion differently than the College administration did on June 2, we disapprove PERC’s finding that the administration unlawfully restricted solicitation and its order that the College permit solicitation at times and in a manner not further specified by PERC.
Nor is there any substantial evidence that the College prevented distribution of materials among employees on nonworking time in areas where actual work is normally performed. We need not pause to inquire whether a teacher’s office is at all times a “work” or “nonwork” area for purposes of distribution restrictions, for PERC has not done so; and PERC has not pinpointed any particular area where distribution among employees should have been, but was not, permitted. PERC’s remedial order leaves intact the same natural uncertainty that the administration and employees confronted in their early negotiation of guidelines for distribution. In such a state there can be no finding that, in some theoretical way, the administration violated PERA.

The access issue

Again adopting NLRA policies applicable in the private sector, PERC’s order distinguishes between employer solicitation/distribution regulations, which typically restrict employees rightfully on the job-site in their oral and written solicitation of fellow employees, and employer regulations which restrict access to the jobsite, or to certain places there, by nonemployee union organizers. When access in this sense is the matter in issue in NLRA litigation, the employer’s property interests, as distinguished from his employee management interests, are generally held to prevail over employee interests in access by nonemployee organizers, when effective alternative means of offsite access are available to union organizers, and when the employer has not capriciously excluded nonemployee union organizers while admitting nonem-ployee solicitors for other purposes. Republic Aviation Corp. v. NLRB, 324 U.S. 793, 65 *1386 S.Ct. 982, 89 L.Ed. 1372 (1945); NLRB v. Babcock & Wilcox Co., 351 U.S. 105, 76 S.Ct. 679, 100 L.Ed. 975 (1956); Hudgens v. NLRB, 424 U.S. 507, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976).
In this case PERC held the College guilty of interfering with and restraining employees in their exercise of Section 447.301 collective bargaining rights, by (1) refusing a request first made March 20, 1975, by Mr. Jensen, instructor in drafting and design at the College and president of OWHEA, for organizational meeting space in room E-043 of the Learning Resources Building; and by (2) refusing his request for postage-free use of the College mail distribution system, consisting of a mailroom from which College employees place postage-paid mail and postage-free “college related bulletins” in combination-locked boxes which teachers open from outside.
The DOAH hearing officer recommended findings that the College did not commit unfair labor practices because (1) there was ample opportunity for OWHEA to meet with interested faculty members in off-campus facilities: and (2) postage-paid union mail was regularly received and distributed through the mailroom, and the union otherwise had ample opportunity to communicate with faculty members.
PERC’s order rejects the hearing officer’s proposals on the principal ground that the administration’s refusal of meeting and postage-free mailroom privileges was the result of unlawful discrimination against collective bargaining activities, in that the College freely afforded use of the same facilities to other nonemployee solicitors and non-College organizations.
NLRA administrative and judicial decisions affecting the private sector seem not wholly adequate to measure employee organizational rights as against administration “property rights” in public facilities, especially educational institutions whose only product is ideas. For that reason, perhaps, there is a disturbing lack of continuity in PERC’s analysis, ultimate findings, and corrective order on the access issue. PERC’s analysis treats the question of room E-043 and the mailroom as though the request for their use was made by only College employees:
The fact that OWHEA had other available channels of communication through which it could have reached members of the faculty is of no moment in the instant case. When employees as opposed to non-employee organizers, are discrimina-torily denied access to an employer’s facilities, the employer violates Section 447.501(l)(a), Florida Statutes (1975). Traditional federal labor policies which apply the “alternative means” test are inapplicable in that these cases involve non-employee organizers requesting access to an employer’s premises. See generally NLRB v. Babcock & Wilcox Co., 351 U.S. 105 [76 S.Ct. 679, 100 L.Ed. 975] (1956). (Emphasis added.)
Yet PERC’s ultimate finding suggests a purpose to assure access by nonemployee union solicitors:
By discriminatorily denying employees of OWHEA access to the college’s mailing and meeting room facilities the Respondent engaged in an unfair labor practice . . .. (Emphasis added.)
And PERC’s corrective order seemingly provides unlimited access to solicitors and purveyors of messages of every kind in the world at large. Thus, PERC orders the administration to post conspicuous notices for 60 days saying “IT HAS BEEN DETERMINED THAT WE HAVE VIOLATED THE LAW . . . ” and:
We will allow access to campus facilities, including the mail system and meeting rooms, in a non-discriminatory manner to all organizations and/or individuals desiring to solicit and/or distribute literature.
This unexplained progression in reasoning does not meet the requirements of the Administrative Procedure Act of 1974, to which PERC is subject as the agency charged with the critical responsibilities in the administration of PERC. See McDonald v. Dept. of Banking and Finance, 346 So.2d 569 (Fla. 1st DCA 1977). Moreover, in the order’s exposition of access issues involving room E-043, the entire *1387 piece is strangely unrelated to the request actually made by Mr. Jensen on March 20, 1975, which was:
We request the use of Room E-043, Learning Resources Building, for a meeting of the entire faculty from 11:00 a. m. to 1:00 p. m. on Thursday, March 27. This location has already been used for three faculty meetings [on collective bargaining, one of which was specifically for the presentation of the Board’s position on this issue.][9] We expect to have two guest speakers: first, Jim Davenport, who is the President of the NEA Higher Education Association; and second, the new President of Hillsborough Community College Faculty Association, an NEA-FUSA affiliate. They will discuss the positive aspects of collective bargaining for higher education faculty as public employees. .
Thus Mr. Jensen, a College instructor and president of OWHEA, requested the College president (1) to call a meeting of the entire faculty (2) in room E-043 of the Learning Resources Building (3) from 11 until 1 o’clock on a certain Thursday or (as later requested) on any weekday (4) where two nonemployees would speak to the faculty about the positive aspects of collective bargaining.
If PERC were presented with a college president’s refusal to permit faculty employees to meet voluntarily in an available classroom during nonworking hours to discuss collective bargaining, that would be a different case. Then it would be pertinent that the administration permitted faculty members so to meet in available classrooms, during nonworking hours, for discussion of other noncurricular matters; and PERC might well conclude that the administration discriminatorily refused a meeting room in order to interfere with employee collective bargaining efforts. But that is not this case.
If PERC were presented with a college president’s refusal to permit nonemployee union organizers to join and participate in a voluntary meeting of some faculty members, that too would be a different case. In that event also it would be pertinent that the administration opened available classrooms during slack periods to nonemployees speaking for or otherwise serving the purposes of such noncurricular organizations as the Red Cross, the Florida Association of Community Colleges, the American Association of University Women, the local concert orchestra, and armed forces recruiters.[10] Unless a college excludes all onsite expression by nonemployees — preferring, in the style of a medieval cloister, to hear only readings of the official catechism — PERC may well be empowered to find it an unfair labor practice for a college administration to exclude from meeting rooms the offensive ideas of nonemployee union organizers, while entertaining organizational solicitations by nonemployee spokesmen for more favored causes. See St. Petersburg Junior College v. PERC, 358 So.2d 1103, 1105-06 (Fla. 1st DCA 1978) (opinions of Judges Smith and Ervin). But that is not this case.
What was requested and denied in this case was an administration-called “meeting of the entire faculty” in room E-043 throughout a two-hour period in part of which many if not all faculty members were regularly scheduled to be in their offices for access by students, and when some teachers had conflicting meetings of other sorts, related to the College program.
*1388 We have been referred to no NLRA or other precedent, and we have found none, which would seem to require the College administration to call and thus sponsor, for employee organizational purposes, an “entire faculty” meeting to hear nonemployee labor spokesmen. (Even so, the College president invited union spokesmen, including Mr. Jensen of the nascent OWHEA, to speak at a full faculty meeting called for various purposes on November 10, 1974.) Certainly no precedent has been cited, and no rationale advanced by PERC, which would require the College president to preempt otherwise scheduled faculty working time for such a meeting. (College counsel thought to do so would violate the statutory proscription of soliciting employees during working hours. At one time OWHEA’s Mr. Jensen evidently thought so too; he declined the president’s invitation to speak to the faculty on November 19,1974, saying he was instructed by OWHEA “to make all public statements of purpose and advantages of membership in off-campus meetings . . .,” so avoiding “any possible infringement or charge of improper solicitation.”)
We find nothing in the record justifying PERC’s treatment of Mr. Jensen’s letter of March 20, 1975, and his subsequent requests, as only for meeting space in room E-043 for employees who wished to gather and discuss collective bargaining during nonworking time; nor any basis for PERC’s conclusion of law that the administration wrongfully denied access to “employees of OWHEA”; nor any plausible reason for requiring the administration to post a self-deprecating notice promising meeting rooms indiscriminately “to all organizations and/or individuals desiring to solicit and/or distribute literature.” In this respect PERC’s order will be vacated.
PERC’s order has a sounder basis in finding that the College administration discriminated against union-motivated employees, and against nonemployee spokesman for OWHEA, in denying them postage-free use of the College mail distribution system. The record shows the College made its mailroom available to handle mailbox distribution of soliciting memoranda and other literature delivered to the mail-room in reasonable volume by both the Florida Association of Community Colleges and the American Association of University Women. Through the College’s postage-free mail distribution system the FACC solicited faculty unity and financial support by a memorandum similar in appeal, if not in precise purpose, to literature which employees wished so to distribute promoting the union:
We need help! As the only united voice speaking for community colleges in Tallahassee and throughout the state, FACC is only as strong as we make it. In politics, as perhaps nowhere else, numbers count. Memberships are numbers and dollars. To do the job you expect FACC to do, it needs both!

FACC activates help all personnel alike, non-member as well as members. If you have renewed your membership or joined new this year, we sincerely appreciate your support. If you have not joined, won’t you please consider doing so. We need you. It is my honest opinion that you will not receive as much for your money ($15.00) from any other organization.
Explaining why FACC advocates were permitted postage-free use of the mail distribution system and OWHEA advocates were not, the College president testified:
We feel that it is within our right to make the decision that our mailboxes will not be used by that organization [OW-HEA] ... in which we have no institutional membership. . . . It is not an organization in which we have institutional membership. It is not a chartered student organization. It is not an internal activity of our institution. On those bases — it is an outside organization at this time.

Secondly, that this organization [FACC] is not engaged in organizing ac *1389 tivities and this type of thing as a potential organization involved in employee organization activities, this type of thing. This would be one reason. There are many others.
PERC was empowered to regard the administration’s denial of postage-free mailroom privileges for pro-union literature as aimed at deterring pro-union access to facilities which were open to other organizational messages of interest to the academic community. There can be no persuasive claim by the administration that pro-union material was submitted in such volume as to tax the College’s mailroom and its personnel there; they handled without incident postage-paid union mail addressed to faculty members, as well as a considerable quantity of an anti-union memoranda by the administration to the faculty. We do not hold that a college administration must in all events permit access to facilities for pro-union solicitation and distribution, if the administration similarly uses those facilities for anti-union messages;[11] we do hold that PERC may correct discrimination against pro-union access to its facilities when the administration has opened those facilities for nondisruptive use in behalf of other causes and organizations not indigenous to the campus. The College’s “institutional membership” in certain nonindige-nous organizations such as FACC and AAVW does not qualify them for favored treatment as against union causes not bearing that imprimatur. When access is denied to pro-uniori messages only because the administration disapproves the message, interference with PERA-secured organization rights is established.
The College administration’s absolute control of its postage-free mailroom privileges is subject only Jo a qualification against discrimination. Except when it may be demonstrated that a PERC-au-thored policy of expanding the use of those facilities is necessary to remedy discriminatory deprivations having present effect on employees’ bargaining rights, PERC is not empowered to preempt the employer’s power to make its facilities uniformly inaccessible to all nonindigenous causes and organizations; and, as PERC’s statutory authority is limited to collective bargaining concerns, it may not require an access remedy, as it seemingly has done in this case, for “all organizations and/or individuals desiring to solicit and/or distribute literature.” PERC’s order finding the College administration guilty of an unfair labor practice in the matter of mailroom access will be affirmed, but the case will be remanded for PERC’s fashioning of a more exact remedial notice, consistent with this opinion.

The Leatherwood subpoena incident

On December 30, 1975, two weeks before the DOAH hearing officer convened the final hearing, counsel for the College applied to PERC’s chairman Mack for a subpoena duces tecum directed to John Leatherwood, then OWHEA’s president, directing him to appear at the hearing with certain records of OWHEA including:
3. Any documents or other written materials reflecting dates, places and times of any and all meetings held by OWHEA where employees of OWJC were in attendance, including but not limited to any minutes of such meetings.
*1390 The subpoena was issued in accordance with PERC’s-Rule 8H-4.14, Fla.Admin.Code, providing for ex parte applications for subpoenas, issuable as a matter of course by PERC’s chairman if the final hearing has not commenced, or by the hearing officer if it has.
On or before January 9, 1976, a letter objection by the witness Leatherwood, dated January 7, was received by PERC’s chairman Mack. On that date Leatherwood mailed a copy of his letter objection to counsel for the college, which he received on or before January 14, 1976, when the hearing officer commenced the final hearing. After argument by counsel for OW-HEA and the College, in the presence of PERC’s acting general counsel, the hearing officer overruled Leather wood’s objection to the subpoena duces tecum.
Following a recess of the final hearing until January 26, PERC’s acting general counsel filed with PERC’s chairman Mack, on January 23, a petition for revocation of Leatherwood’s subpoena duces tecum on grounds, applicable to category 3 above, that it described any relevant material too broadly and that “union records are of a confidential nature and should not be lightly compelled over objection.” The petition did not refer to the hearing officer’s prior hearing and ruling of January 14. On the day of filing, January 23, PERC’s acting general counsel served a copy of the revocation petition on counsel for the College, by mail; but chairman Mack on that very day entered an order revoking the subpoena’s call for the records described in category 3, on grounds that the College had not responded to Leatherman’s January 7 objection within five days, as required by PERC’s rule,[12] consequently that no relevance was shown, and that, in any event, “union records . . . should remain confidential when the union objects to their disclosure, except in extraordinary circumstances.”
We earnestly disapprove this preemption by PERC of the hearing officer’s control, during the adjourned final hearing, of subpoenas returnable at the hearing. We especially disapprove the ex parte handling of the Leatherwood objection by PERC’s general counsel, then acting as prosecuting officer in OWHEA’s behalf, and PERC’s then chairman. Such obviously inappropriate conduct by PERC casts doubt on its capacity to operate fairly in its statutory role. Trusting that PERC’s present counsel will desist from such ex parte double-agent activity, and that PERC’s present chairman will refuse to intervene in matters before a hearing officer, we add nothing except our assurance that appropriate sanctions will be imposed for PERC actions tending to destroy its impartiality in decisionmaking.

Other issues

We affirm PERC’s order refusing OWHEA another election on account of the alleged unfair labor practices of the College administration. So finding, and approving PERC’s unfair labor practices findings only in respect to the administration’s discriminatory denial of postage-free access to its mailroom facilities, we find no other procedural error by PERC requiring appellate remedies.
PERC’s order is therefore REVERSED in part, AFFIRMED in part, and the case us REMANDED for further PERC proceedings narrowing and refining the notice-remedy for the College’s unfair labor practice in discriminatorily denying mailroom access for organizational messages.
McCORD, C. J., and BLACK, SUSAN H., Associated Judge, concur.

. Section 120.68(8), Florida Statutes (1978 Supp.)

. The charge was:
Since on or about April 1, 1975, the above-named employer, by its officers and agents, has refused and continues to refuse to permit the Okaloosa-Walton Higher Education Association, and its agents and representatives, access to and utilization of premises under the control of the public employer, for the purpose of communicating with employees employed by the employer, notwithstanding the purpose of Florida Statute Section 447.-020 [sic; 447.509(l)(b)] to permit use of premises excepting as proscribed by the aforementioned statutory provision.

.We thus read PERC’s solicitation/distribution complaint as pertaining to the right of employees to communicate to fellow employees on campus, as distinguished from the asserted right of access for similar purposes by OWHEA agents and proponents unaffiliated with the College. By that interpretation we do not transform PERC’s interpretation of PERA but rather translate the federal NLRA decisions on which PERC hinges its definition of unfair labor practices of this character.

. In Beth Israel the Court noted that restrictions on employee-to-employee distributions are presumptively unlawful, absent “special circumstances which make the rule necessary to maintain production or discipline,” when the distribution occurs “only in nonworking areas.”

. Babcock & Wilcox, 351 U.S. at 112, 76 S.Ct. at 684, 100 L.Ed. at 982-83.

. Section 447.503(4)(d):
No complaint shall be issued based upon any unfair labor practice occurring more than 6 months prior to the filing of the charge with the commission, unless the person aggrieved thereby was prevented from filing the charge by reason of service in the Armed Forces

. See fn. 2, supra.

. One employee witness testified that “working time” includes “practically all the time that I’m on campus, over 34 hours each week . except for my lunch period.” If PERC proposes to distinguish between a teacher’s “required office hours” and his or her time in the office at other times, that does not appear from PERC’s order.

. Mr. Jensen’s March 20 letter first stated, erroneously, that room E-043 had already been used for three faculty meetings “informing us of the Board’s position on collective bargaining.” When his error was called to his attention by the College president, Jensen amended his letter to read as above. The College president said also that the one meeting where the “Board’s position” was stated was held immediately after the faculty meeting, and attendance was optional as announced.

. PERC’s order found that the named organizations, as well as “various political candidates, Vietnam Veterans and insurance and textbook salesmen have been granted access to campus meeting rooms and given special mailing privileges.” The record shows that Senator Graham appeared to speak on educational legislative issues and that Vietnamese refugees came to learn English in a voluntary program, but shows nothing else concerning “various political candidates” and “Vietnam Veterans.”

. Contrast Bonwit Teller, Inc., 28 LRRM 1547, 1548 (1951):
That is not to say that an employer is proscribed from addressing his employees and urging that they reject a union unless he invites a union representative to come into his plant and make an appeal for support of the union. Nor does it mean that under any and all circumstances an employer is under an obligation to accede to a union’s request that it be granted an opportunity to address the employees on the employer’s premises. It is to say that an employer who chooses to use his premises to assemble his employees and speak against a union may not deny that union’s reasonable request for the same opportunity to present its case, where the circumstances are such that only by granting such request will the employees have a reasonable opportunity to hear both sides. (Emphasis added.)
In the case before us both the hearing officer and PERC found OWHEA had a reasonable opportunity to make its message heard; and on that account PERC refused to invalidate the election.

. PERC Rule 8H-4.14 provides:
If the requesting party opposes revocation of the subpoena, he shall, within five (5) working days from the date he is notified of the petition to revoke, file with the Chairman or Hearing Officer affidavits stating the relevant evidence which he believes may be obtained from the subpoenaed person.