NATIONAL LABOR RELATIONS BOARD *v.*
MAGNAVOX COMPANY OF TENNESSEE

No. 72–1637.  Argued January 14–15, 1974—
Decided February 27, 1974

DOUGLAS, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, WHITE, MARSHALL, and BLACKMUN, JJ., joined. STEWART, J., filed an opinion concurring in part and dissenting in part, in which POWELL and REHNQUIST, JJ., joined, *post*, p. 327.

*Peter G. Nash* argued the cause for petitioner.  With him on the brief were *Solicitor General Bork, John S. Irving, Patrick Hardin,* and *Norton J. Come.*

*George K. McPherson, Jr.,* argued the cause and filed a brief for respondent. *Winn Newman* and *Ruth Weyand* filed a brief for the International Union of Electrical, Radio & Machine Workers, AFL–CIO, petitioner below, urging reversal.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

In 1954, the International Union of Electrical, Radio, and Machine Workers (IUE) became the collective-bargaining representative of respondent's employees. At that time respondent had a rule prohibiting employees from distributing literature on any of its property, including parking lots and other nonwork areas. The collective agreement authorized the company to issue rules for the "maintenance of orderly conditions on plant property," provided the rules were not "unfair" or "discriminatory." It also provided that bulletin boards would be available for the posting of union notices, subject to the company's right to reject "controversial" notices. All subsequent contracts contained similar provisions. Throughout the period since 1954 respondent has prohibited employees from distributing literature even in nonworking areas during nonworking time.

In due course, the IUE challenged the validity of the company's rule and requested that the rule be changed. The request was denied and the IUE filed charges against respondent for unfair labor practices in violation of § 8 (a)(1) of the National Labor Relations Act, 49 Stat. 452, as amended, 29 U. S. C. § 158 (a)(1). The Board held for the IUE, following its earlier decision in *Gale Products,* 142 N. L. R. B. 1246, where it had said:

"Their place of work is the one location where employees are brought together on a daily basis. It is the one place where they clearly share com-

mon interests and where they traditionally seek to persuade fellow workers in matters affecting their union organizational life and other matters related to their status as employees." *Id.,* at 1249.

The remedy in *Gale Products* ran in favor of employees whose distribution project was *to reject* a union representative. The Board in the present case, however, broadened the relief to embrace those who wanted *to support* a union representative, 195 N. L. R. B. 265. The Court of Appeals denied enforcement of the Board's order, because in its view the union had waived objection to the ban on on-premises distribution of literature and had the authority to do so. 474 F. 2d 1269. The case is here on petition for certiorari, which we granted because of the conflict between this decision of the Court of Appeals for the Sixth Circuit with that of the Eighth in *International Association of Machinists* v. *NLRB,* 415 F. 2d 113, and that of the Fifth in *NLRB* v. *Mid-States Metal Products,* 403 F. 2d 702.

Employees have the right recognized in § 7 of the Act "to form, join, or assist labor organizations" or "to refrain" from such activities. 29 U. S. C. § 157. We agree that a ban on the distribution of union literature or the solicitation of union support by employees at the plant during nonworking time may constitute an interference with § 7 rights. The Board had earlier held that solicitation outside working hours but on company property was protected by § 7 and that a rule prohibiting it was "discriminatory in the absence of evidence that special circumstances make the rule necessary in order to maintain production or discipline." *In re Peyton Packing Co.,* 49 N. L. R. B. 828, 843–844. We approved that ruling in *Republic Aviation Corp.* v. *NLRB,* 324 U. S. 793, 801–803. No contention is made here that considerations of production or dis-

cipline make respondent's rule necessary. The sole issue concerns the power of the collective-bargaining representative to waive those rights.

The union may, of course, reach an agreement as to wages and other employment benefits and waive the right to strike during the time of the agreement as the *quid pro quo* for the employer's acceptance of the grievance and arbitration procedure. *Textile Workers* v. *Lincoln Mills,* 353 U. S. 448, 455. Such agreements, however, rest on "the premise of fair representation" and presuppose that the selection of the bargaining representative "remains free." *Mastro Plastics Corp.* v. *NLRB,* 350 U. S. 270, 280. In that case we held that the waiver of the "right to strike" did not embrace a waiver of the right to strike "against unlawful practices destructive of the foundation on which collective bargaining must rest." *Id.,* at 281. We dealt there with rights in the economic area. Yet, as the Fifth Circuit held in the *Mid-States* case, a different rule should obtain where the rights of the employees to exercise their choice of a bargaining representative is involved—whether to have no bargaining representative, or to retain the present one, or to obtain a new one. When the right to such a choice is at issue, it is difficult to assume that the incumbent union has no self-interest of its own to serve by perpetuating itself as the bargaining representative. 403 F. 2d, at 705. The place of work is a place uniquely appropriate for dissemination of views concerning the bargaining representative and the various options open to the employees. So long as the distribution is by employees to employees and so long as the in-plant solicitation is on nonworking time, banning of that solicitation might seriously dilute § 7 rights. For Congress declared in § 1 of the Act that it was the policy of the United States to protect "the exercise by

workers of full freedom of association, self-organization, and designation of representatives of their own choosing." 29 U. S. C. § 151.

. It is argued that the use of the bulletin board is a fair substitute. But as the Fifth Circuit said in the *Mid-States* case the bulletin board may be an adequate medium for "preserving the status quo" and yet not give a union's adversaries "equal access to and communication with their fellow employees." 403 F. 2d, at 705.

Moreover, a limitation of the right of in-plant distribution of literature to employees opposing the union does not give a fair balance to § 7 rights, as the Board ruled in the present case. For employees supporting the union have as secure § 7 rights as those in opposition. The Board's position, as noted, has not always been consistent. But its present ruling is, we think, quite consistent with § 7 rights of employees. It is the Board's function to strike a balance among "conflicting legitimate interests" which will "effectuate national labor policy," including those who support *versus* those who oppose the union. *NLRB* v. *Truck Drivers Union,* 353 U. S. 87, 96. Moreover, as respects employers, the rights of solicitation of employees by employees concerning § 7 rights are not absolute. As we noted in *Republic Aviation Corp.* the . Board may well conclude that considerations of production or discipline may make controls necessary. No such evidence existed here and the trial examiner so found. Accordingly, this is not the occasion to balance the availability of alternative channels of communication* against

---

*IUE, in a brief supporting the Board's position, states there are some 2,300 employees in the bargaining unit who live scattered over a two-state area covering more than 100 square miles. The plant is located in Greenville, Tennessee. Some workers live 30 miles distant in Johnson City, Tennessee, and others live in Morrison, North Carolina. It claims that handing out leaflets at the plant gate is impractical as cars enter or exit four abreast at fast speeds. We mention

a legitimate employer business justification for barring or limiting in-plant communications.

*Reversed.*

MR. JUSTICE STEWART, with whom MR. JUSTICE POWELL and MR. JUSTICE REHNQUIST join, concurring in part and dissenting in part.

To the extent the Court holds that a union cannot contractually waive the right of disaffected employees to distribute in nonwork areas and during nonwork time literature advocating the displacement of the incumbent collective-bargaining representative, I am in complete agreement. This is the essence of the Board's decision in *Gale Products,* 142 N. L. R. B. 1246. But it seems to me wholly inconsistent with the letter and spirit of the National Labor Relations Act to relieve the union of its promise that its own self-serving literature will not be so distributed in the plant.

Although the union is deemed to represent all employees in the bargaining unit, both pro-union and anti-union, and may waive important § 7 rights in the course of collective bargaining, presumably in return for management concessions on other fronts, this authority cannot extend to rights with respect to which the union and the individual employees have essentially conflicting interests. The Board stated the point succinctly in its decision in *General Motors Corp.,* 158 N. L. R. B. 1723, 1727:

> "[T]he employees, by once selecting the union as their representative, do not forfeit their fundamental right to change their representative at appropriate times. When a union acts to abridge that right

these statements not to resolve a controversy, but to indicate at least a part of the range of any inquiry into the need for in-plant solicitation if § 7 rights are to be protected.

in the manner presented in this case, it is essentially benefiting the union *qua* union, to the detriment of the employees it represents."

Any such attempted waiver of the rights of others is so clearly in the union's self-interest of perpetuating its status as the bargaining agent, and at odds with the interests of the disaffected employees, that "the premise of fair representation" underlying contractual waivers of § 7 rights is wholly undermined. *Mastro Plastics Corp.* v. *NLRB,* 350 U. S. 270, 280.

Judicial nullification of contractual concessions, however, is contrary to what the Court has recognized as "[o]ne of [the] fundamental policies" of the National Labor Relations Act—"freedom of contract." *H. K. Porter Co.* v. *NLRB,* 397 U. S. 99, 108. "The theory of the Act is that free opportunity for negotiation with accredited representatives of employees is likely to promote industrial peace and may bring about the adjustments and agreements which the Act in itself does not attempt to compel." *NLRB* v. *Jones & Laughlin Steel Corp.,* 301 U. S. 1, 45. Contractual waivers against a union's own interests are seldom if ever gratuitously granted in the give and take of the collective-bargaining process. In return, the union typically exacts some form of *quid pro quo* from the management negotiators. Since it is usually impossible to identify the consideration given in return for a particular union concession, the result of nullifying a union's agreement to waive the § 7 rights of its supporters will necessarily be to deprive management of the benefit of its bargain and to leave the union with a windfall. This sort of invalidation of bargained-for concessions does not promote stability in the collective-bargaining process and must certainly have a negative effect on labor-management relations. For this reason, the Board and the courts should

not relieve the parties of the promises they have made unless a contractual provision violates a specific section of the Act or a clear underlying policy of federal labor law.

In *Gale Products* the Board correctly determined that the union could not waive the distribution rights of employees who sought to distribute literature advocating the ouster of the incumbent union; for the clear policy of federal labor law forbids either the union or the employer to freeze out another union or to entrench the incumbent union by infringing the § 7 rights of dissident employees. I see no justification, however, for the Board's extension of the *Gale Products* rule to prevent the union's waiver of the distribution rights of its supporters in the bargaining unit.*

The considerations that distinguish the waiver of supporters' distribution rights from the waiver of opponents' distribution rights were cogently stated by the Fifth Circuit in *NLRB* v. *Mid-States Metal Products,* 403 F. 2d 702, 705:

> "Where union and employee interests are one it can fairly be assumed that employee rights will not be surrendered except in return for bargained-for concessions from the employer of benefit to employees. But the rationale of allowing waiver by the union disappears where the subject matter waived goes to the heart of the right of employees to change their bargaining representative, or to have no bargaining representative, a right with respect to which the interests of the union and em-

---

*The Board held, and I presume the Court agrees, that the union could waive any right that the employees might have to distribute union institutional literature. The only question in this case relates to the waivability of rights to distribute literature regarding the proposed selection, retention, or displacement of the collective-bargaining agent.

ployees may be wholly adverse. Solicitation and distribution of literature on plant premises are important elements in giving full play to the right of employees to seek displacement of an incumbent union. We cannot presume that the union, in agreeing to bar such activities, does so as a bargain for securing other benefits for the employees and not from the self-interest it has in perpetuating itself as bargaining representative.

"A waiver of the right to solicit and distribute literature does not hamper the union as it does the union's adversaries. The union can communicate through the bulletin board, union meetings and the force of status as bargaining representative, enjoying an advantage in preserving the status quo. Its adversaries will not have equal access to and communication with their fellow employees."

In nullifying the union's promise to waive the literature-distribution rights of its own supporters, the Board and today the Court are upsetting the delicate balance achieved in the give and take of negotiations and presenting the union with an undeserved windfall. This nullification, at the behest of the union that made the promise, can only contribute to future instability in collective bargaining between labor and management.

One can, of course, envision exceptional circumstances in which the union supporters' access to and communication with their fellow employees in the bargaining unit might be so restricted that it would be extremely difficult, in the absence of their § 7 distribution rights, for them to respond to the arguments made in literature distributed by their opponents. In such a case, the waiver of the supporters' rights might result in such a distortion of the labor political process as to prevent the balanced presentation of the issues to the em-

ployees that national labor policy seeks to promote. This concern was aptly expressed by the Board in its *General Motors* decision, 158 N. L. R. B., at 1726:

> "[W]e recogniz[e] the salutary purpose of refusing to disturb concessions yielded by either party through the processes of collective bargaining even where such a concession may infringe upon rights guaranteed employees under Section 7 of the Act. . . . [T]he validity of a particular concession or waiver must depend upon whether the interference with the employees' statutory rights is so great as to override any legitimate reasons for upholding the waiver, or would unduly hamper the employees in exercising their basic rights under the Act." (Internal quotations omitted.)

Thus, if in the absence of § 7 distribution rights the union supporters would be incapable of adequately presenting their position to the employees in a representation controversy, a strong argument could be made that the union's agreement was contrary to a basic policy of the National Labor Relations Act and that, despite the negative effect on the bargaining process, the union's promise could not be effective.

In this case, however, there is no suggestion of such exceptional circumstances that would incapacitate the union's supporters in any dispute regarding the union's continued status as the collective-bargaining agent. It is clear from the record that the union supporters have access to the company bulletin boards; that they may still solicit support, although not distribute literature, in nonwork areas during nonwork time; and that they may distribute literature, and have done so in the past, at the gates of the plant. Thus, it is evident that the union supporters would not be disabled by this provision of

the collective-bargaining agreement from maintaining their end of the political discourse that national labor policy seeks to foster.

I cannot agree to a general rule that allows the Board to nullify the union's promise, contained in a collective-bargaining agreement, that its supporters will not distribute literature in the plant. For this reason, I dissent from the judgment and the opinion of the Court insofar as they hold that the union could not validly waive the distribution rights of the employees who support it.