**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**NIAGARA MACHINE & TOOL WORKS and Local 508, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Respondents.**

No. 65, Docket 84–4005.

United States Court of Appeals, Second Circuit.

Argued Sept. 4, 1984.

Decided Oct. 12, 1984.

John D. Burgoyne, Asst. Gen. Counsel, N.L.R.B., Washington, D.C. (Wilford W. Johansen, Acting Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., of counsel), for petitioner.

Ralph O. Jones, Associate Gen. Counsel, UAW Local 508, Detroit, Mich. (Jordan Rossen, Gen. Counsel, Leonard R. Page, Associate Gen. Counsel, Detroit, Mich., of counsel), for respondent UAW Local 508.

John F. Donovan, Buffalo, N.Y. (Phillips, Lytle, Hitchcock, Blaine & Huber, Buffalo, N.Y., of counsel), for respondent Niagara Mach. & Tool Works.

Before FEINBERG, Chief Judge, and MESKILL and NEWMAN, Circuit Judges.

FEINBERG, Chief Judge:

Petitioner National Labor Relations Board (NLRB or the Board) seeks enforcement of a decision and order issued against respondent Niagara Machine & Tool Works (the Company) and respondent Local 508, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the Union). The Board found that in enforcing and threatening to enforce a provision in the Company's collective bargaining agreement that granted superseniority to certain union officials, the Company violated sections 8(a)(1) and (3) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), (3), and the Union violated sections 8(b)(1)(A) and (2), 29 U.S.C. § 158(b)(1)(A), (2). For reasons stated below, we grant the Board's application for enforcement of its order.

## I.

The facts found by the Board are fully set out in its decision, reported at 267 N.L.R.B. No. 112, and are briefly summarized here. On May 1, 1980, the Company and the Union entered into a three-year collective bargaining agreement, which contained a provision, reproduced at the margin,[1] granting superseniority to five members of the Union's executive board, among others. The same provision had appeared in prior agreements since 1947, but apparently had not been invoked before 1981.

Between November 1981 and April 1982, the provision was invoked on behalf of three members of the executive board, causing the layoff of six employees, each with greater seniority in terms of length of employment ("normal" seniority) than the executive board member protected by the provision. In particular, Recording Secretary Cherry Germann exercised her superseniority three times, causing the layoff of three workers with greater normal seniority. Joseph Duncan, a union guide, twice exercised his superseniority, causing the layoff of two workers with greater normal seniority. Sergeant-at-Arms Clay Wilson exercised his superseniority once, causing the layoff of one worker with greater normal seniority. In addition, a Company supervisor told an employee that he would be laid-off in order to retain Robert Hayes, a union trustee and member of the executive board. This predicted layoff, however, apparently never occurred.

The executive board acts on behalf of and makes recommendations to the Union membership. It participates in the formulation of bargaining demands and makes recommendations to the membership on strike votes. All board recommendations, however, including those relating to grievance processing and collective bargaining, are subject to the final authority of the membership. Moreover, the executive board has delegated direct handling of grievances and bargaining to the shop committee. (Although shop committee members also receive superseniority, their status is not at issue here.) None of the four officers involved in this case was a member of the shop committee. Moreover, none had significant responsibility for contract negotiations or grievance handling. The only in-plant function of the four officers stemming solely from executive board membership involved answering questions about the Union from fellow employees and relaying information from the Company to unit employees.

---

1. Article IV, paragraph 5, of the collective bargaining agreement provides:

 Notwithstanding his position on the seniority list, each member of the Shop Committee and not more than five (5) members of the Executive Board shall, at the point where they would be subject to lay-off from the plant, be continued at work as long as there is a job in the plant that they are able to do. Each Steward shall, in the event of a lay-off, be continued at work as long as there is a job in his respective zone which he is able to do and while any of his respective constituents are still at work and shall be recalled to work after the lay-off as soon as there is a job is his respective zone which he is able to do and as soon as any of his respective constituents have been recalled to work.

In her capacity as recording secretary, Germann performed the bulk of her duties away from the plant. In fact, the only duty of that office requiring her presence at the plant was maintenance of the Union bulletin board. Clay Wilson, the Union's sergeant-at-arms, had no in-plant duties specific to that office. Nor did Joseph Duncan have any in-plant duties as a union guide. Robert Hayes, as a trustee, occasionally signed vouchers for Union expenditures in the plant, but had no other in-plant duties.

In September 1982, the Board's General Counsel filed a complaint against the Company and the Union, charging that enforcement (and threatened enforcement) of the superseniority provision contravened the Act. After a hearing, the Administrative Law Judge (ALJ) found that the provision in question was lawfully applied and dismissed the complaint. The NLRB disagreed, and concluded that the Company and the Union had violated the Act by enforcing the superseniority provision. The Board relied on the new rule recently enunciated in *Gulton Electro-Voice, Inc.,* 266 N.L.R.B. 406 (1983), *enf'd sub nom. Local 900, International Union of Electrical, Radio & Machine Workers v. NLRB,* 727 F.2d 1184 (D.C.Cir.1984). The Board's order, among other things, required the parties to cease and desist from violating the Act and jointly and severally to reimburse the laid-off employees for loss of earnings. This petition by the Board followed.

## II.

Section 7 of the National Labor Relations Act, 29 U.S.C. § 157, expresses the Act's policy of insulating employees' jobs from their organizational rights so that job rights and benefits are not dependent on union activities. *See Radio Officers' Union v. NLRB,* 347 U.S. 17, 40, 74 S.Ct. 323, 335, 98 L.Ed. 455 (1954); *NLRB v. Milk Drivers & Dairy Employees, Local 338,* 531 F.2d 1162, 1163, 1166–67 (2d Cir. 1976). Sections 8(a)(3) and 8(b)(2) prohibit employers and unions from discriminating with respect to tenure or terms of employment in a way that encourages or discourages union membership; these sections are designed to protect, among other things, the right of employees to be good, bad or indifferent union members. *Radio Officers' Union, supra,* 347 U.S. at 40, 74 S.Ct. at 335; *NLRB v. Local 50, American Bakery & Confectionery Workers Union,* 339 F.2d 324, 328 (2d Cir.1964), *cert. denied,* 382 U.S. 827, 86 S.Ct. 62, 15 L.Ed.2d 72 (1965). Not every action that encourages or discourages union membership is unlawful, however. If the allegedly discriminatory action is not "inherently destructive" of employee rights, an employer or union can prevail if it shows "legitimate and substantial business justifications" for the action. *NLRB v. Great Dane Trailers,* 388 U.S. 26, 34, 87 S.Ct. 1792, 1798, 18 L.Ed.2d 1027 (1967); *Local 900, supra,* 727 F.2d at 1186.

The Board first addressed the validity of superseniority provisions in *Dairylea Cooperative Inc.,* 219 N.L.R.B. 656 (1975), *enf'd sub nom. NLRB v. Milk Drivers & Dairy Employees, Local 338, supra.* In that case, the Board considered the validity of a provision in a collective bargaining agreement that gave shop stewards superseniority not only for layoff and recall purposes but also for all benefits under the agreement where seniority was a factor. The Board stated that while superseniority discriminates on the basis of union-related activities and hence is in tension with section 7 of the Act, the benefits that limited types of superseniority furnish to all unit employees compensate for the inherent discrimination. *Id.* at 658. The Board concluded that superseniority provisions for the shop stewards, limited to layoff and recall, are presumptively valid, while superseniority provisions as to other job benefits are presumptively invalid. *Id.*

Following *Dairylea,* the Board was faced with the question of whether superseniority for layoff and recall could be extended beyond shop stewards to other union officers. *United Electrical, Radio & Machine Workers of America, Local 623 (Limpco),* 230 N.L.R.B. 406 (1977), *enf'd sub nom.*

*D'Amico v. NLRB,* 582 F.2d 820 (3d Cir. 1978), answered that question in the affirmative. The Board ruled, however, that such superseniority for other officials would be upheld only upon a showing that they have responsibilities that bear "a direct relationship to the effective and efficient representation of unit employees" by the bargaining unit. *Id.* at 407–08. In assessing the activities of union officials, the *Limpco* decision also appeared to extend the rationale of *Dairylea* by focusing on the entire collective bargaining process, which requires a functioning union organization, rather than merely on in-plant, on-the-job activities. The *Limpco* decision and subsequent cases revealed a deep division within the Board. *See, e.g., American Can Co.,* 244 N.L.R.B. 736, 737 (1979) ("Board members have widely divergent views on *Dairylea* issues."), *enf'd,* 658 F.2d 746 (10th Cir.1981); *Local 900, supra,* 727 F.2d at 1886–88 (outlining history of the Board's treatment of superseniority provisions). Nevertheless, the Board's decisions after *Limpco* generally followed this pattern:

> So long as a superseniority clause was limited to layoff and recall and pertained to functional union officers, the Board would presume it lawful, and the General Counsel would have the burden of proving that the clause was unfairly discriminatory. If the General Counsel succeeded, the union and employer could still avoid liability by showing that the clause served a substantial, legitimate purpose.

*Local 900, supra,* 727 F.2d at 1188.

It was against this background that the ALJ here dismissed the complaint, finding that under *Limpco* application of the superseniority provision was lawful. Shortly thereafter, the Board decided *Gulton, supra,* in which it reconsidered the *Limpco* line of cases and held that union officials can qualify for a preference in layoff and recall only where they "must be on the job to accomplish their duties directly related to administering the collective-bargaining agreement." 266 N.L.R.B. at 409. On the basis of the *Gulton* rule, which allows superseniority only if union officials need to be present at the workplace, the Board reversed the ALJ's dismissal of the complaint in this case, and held that the Company and the Union had indeed violated the Act.

## A. Standard of Review

 Before turning to the propriety of the *Gulton* rule and to its application in this case, we emphasize that our standard of review is quite narrow. We must enforce the Board's construction of the Act if it is reasonably defensible, even if we might prefer a different interpretation. *Ford Motor Co. v. NLRB,* 441 U.S. 488, 497, 99 S.Ct. 1842, 1849, 60 L.Ed.2d 420 (1979). The Board's order should be reversed only if it has no reasonable basis in law, *Allied Chemical & Alkali Workers of America, Local Union No. 1 v. Pittsburgh Plate Glass Co.,* 404 U.S. 157, 166, 92 S.Ct. 383, 390, 30 L.Ed.2d 341 (1971), is "fundamentally inconsistent with the structure of the Act," *American Ship Building Co. v. NLRB,* 380 U.S. 300, 318, 85 S.Ct. 955, 967, 13 L.Ed.2d 855 (1965), or moves "into a new area of regulation which Congress had not committed to it," *NLRB v. Insurance Agents' International Union,* 361 U.S. 477, 499, 80 S.Ct. 419, 433, 4 L.Ed.2d 454 (1960).

## B. Formulation and Application of the Gulton Rule

 However we might have decided the matter as members of the Board, the formulation of the rule in *Gulton* was plainly reasonable. The Board is entitled to change its mind, so long as the new general standard is applicable to all litigants. Cf. Winter, Judicial Review of Agency Decisions: The Labor Board and the Court, 1968 Sup.Ct.Rev. 53, 63–64. The Union argues that preferential seniority has long been recognized as serving legitimate and substantial employee interests in effective union representation. We do not question this or the force of the implied argument that the Board therefore should not have formulated the *Gulton* rule. But given the Board's experience, it is ordinari-

ly better equipped than we are to determine what circumstances constitute adequate justification for the discrimination inherent in the granting of superseniority. We will defer to a Board conclusion that particular conduct "adversely affects protected employee interests," *Metropolitan Edison Co. v. NLRB*, 460 U.S. 693, 103 S.Ct. 1467, 1474, 75 L.Ed.2d 387 (1983), unless that conclusion is not reasonably defensible. In enforcing the *Gulton* rule, Judge McGowan of the D.C. Circuit stated that

> we must uphold defensible Board decisions, regardless of how we might have decided the matter in the first instance .... [The Board] surely has arrived at one reasonable resolution of the problem in a reasonable manner. We will not substitute our judgment on a question of policy when four members of the Board have brought their expert knowledge of labor relations to bear and have reached a unanimous conclusion. We therefore affirm the Board's new presumption of legality restricted to layoff-and-recall superseniority for union officials who must be on the job to administer the collective bargaining agreement.

*Local 900, supra*, 727 F.2d at 1189 (footnote omitted). We agree with the D.C. Circuit.

Nor do we believe that *Aeronautical Industrial District Lodge 727 v. Campbell*, 337 U.S. 521, 69 S.Ct. 1287, 93 L.Ed. 1513 (1949), requires a different result. In *Campbell*, the Supreme Court held that the Selective Service Act, which required that employers restore veterans to the same position they occupied before entering military service "without loss of seniority," did not invalidate a provision in a collective bargaining agreement granting superseniority to union "chairmen" over veterans in the case of layoff. *Id.* at 527–29, 69 S.Ct. at 1290–91. *Campbell* was not decided in the context of an alleged violation of the National Labor Relations Act. Even if it had been, the Board's decision in *Gulton* would not be inconsistent with the Supreme Court's decision in *Campbell*, because there is no reason to believe that the chair-

men in *Campbell* did not meet the on-the-job criteria of *Gulton*.

The Union contends that even if *Gulton* states the appropriate rule, the Board failed to prove that the superseniority clause here "encourage[s] membership" within the meaning of section 8(a)(3) of the Act. It is true that the Board's decision in this case does not directly address the question of encouragement. Nevertheless, all of the superseniority cases—from *Dairylea* to *Limpco* to *Gulton*—proceed from the premise that superseniority encourages workers to be good union members so that they might increase their chances of being selected for positions afforded superseniority. *See, e.g., Dairylea, supra*, 219 N.L.R.B. at 657–58; *Gulton, supra*, 266 N.L.R.B. at 409. This premise, drawn from the Board's experience in labor relations, is a reasonable one and therefore should not be rejected by a reviewing court. *See Milk Drivers, supra*, 531 F.2d at 1165; *cf. Misericordia Hospital Medical Center v. NLRB*, 623 F.2d 808, 818 (2d Cir.1980). Moreover, the reasonableness of the premise does not depend on whether union officials afforded superseniority are appointed by the union hierarchy, as in *Dairylea, see* 531 F.2d at 1165, or are elected by union members, as is apparently the case here. *See Liquid Carbonic Corp.*, 257 N.L.R.B. 686, 690–91 (1981), *enf'd sub nom. Local 478, International Brotherhood of Teamsters v. NLRB*, 688 F.2d 822 (3d Cir.1982).

The Union also argues that superseniority for Recording Secretary Germann and Sergeant-at-Arms Wilson is justified under *Gulton* because of their in-plant duties. The Board held that neither Germann nor Wilson had significant representational or contract administration duties requiring presence in the workplace. 267 N.L.R.B. No. 112, slip op. at 9. The question before us is whether there is substantial evidence in the record considered as a whole to support the Board's findings on these issues. We hold that there is. The record includes evidence that Germann's

duties are essentially clerical in nature and are performed almost entirely in her home or at union meetings held outside the plant. Her maintenance of the Union's bulletin board, on which the Union relies, takes relatively little time and can be accomplished with only the minor inconvenience of an occasional trip to the plant. In addition, on this record the Board could justifiably find that Wilson's duties as sergeant-at-arms involve only regulating union meetings and do not entail representational duties at or away from the plant. Nor does Wilson's position on the Union's fair practices committee justify the grant of superseniority; Wilson was awarded superseniority not because of that position but because of his status as a union official. Plainly, the Board could find that layoff would not seriously interfere with Germann's or Wilson's duties stemming from executive board membership.

## C. *Waiver*

■ The Union next claims that even if enforcement of the superseniority clause contravenes the Act, the employees waived their statutory right to challenge the clause by ratifying the collective bargaining agreement containing it. The same claim was made in *Gulton* itself, and was rejected by the D.C.Circuit. See *Local 900, supra,* 727 F.2d at 1190.

The Union relies on the recent Supreme Court decision in *Metropolitan Edison Co. v. NLRB, supra,* in which the Court purported both to explain the rationale for permitting waiver of employee rights and to state the rule governing which such rights may be waived:

This Court long has recognized that a union may waive a member's statutorily protected rights, including "his right to strike during the contract term, and his right to refuse to cross a lawful picket line." ... Such waivers are valid because they "rest on 'the premise of fair representation' and presuppose that the selection of the bargaining representative 'remains free.' " ... Waiver should not undermine these premises. Thus a

union may bargain away its members' economic rights, but it may not surrender rights that impair the employees' choice of their bargaining representative. 103 S.Ct. at 1476 (citations omitted). The Union claims that the right to seniority under a contract is an economic right as defined by *Metropolitan Edison* and is therefore waivable. This argument misconceives both the nature of the right at stake and the rationale for the dichotomy between economic and representational rights.

■ The right at issue in this case is not some right to normal seniority; it is instead the right to be free from discrimination that encourages union membership. We agree with the D.C. Circuit, see *Local 900, supra,* 727 F.2d at 1190, that this right is not "economic" under the *Metropolitan Edison* framework. Economic rights, such as the right to strike or to refuse to cross a lawful picket line, are rights that "employees acting in concert, through the collective bargaining agent, may exercise in attempts to achieve economic advantage." *NLRB v. Mid-States Metal Products, Inc.,* 403 F.2d 702, 705 (5th Cir.1968) (footnote omitted). For such economic rights waiver is appropriate because union and employee interests are presumed to coincide; if they do not, the employees remain free to change their bargaining representative. See *NLRB v. Magnavox Co.,* 415 U.S. 322, 325, 94 S.Ct. 1099, 1102, 39 L.Ed.2d 358 (1974).

■ Unlike these economic rights, the right at issue here is one over which union and employee interests are likely to conflict. Under *Gulton,* superseniority is presumed to encourage employees to support the union actively, thereby increasing their chances of attaining union office and winning greater job security. Superseniority thus serves the union's interest in encouraging employees to be "good," active union members. Employees, on the other hand, have the right not to be coerced into supporting the union. Because the union thus has "self-interest of its own to serve," superseniority is in this sense at least suspect. *See id.* at 325, 94 S.Ct. at 1102.

Moreover, in the Board's view to which we defer, superseniority encourages employees to support the incumbent union; therefore, their ability to select a bargaining representative no longer " 'remains free.' " *Id.* (quoting *Mastro Plastics Corp. v. NLRB*, 350 U.S. 270, 280, 76 S.Ct. 349, 356, 100 L.Ed. 309 (1956)); *Local 900, supra*, 727 F.2d at 1190. The right to be free from discrimination that encourages active support of the incumbent union is therefore not amenable to waiver.

## D. *Retroactivity*

■ Finally, both the Union and the Company argue that *Gulton*, even if valid, should not be applied retroactively to this case. "Whether to give retroactive effect to new rules adopted in the course of agency adjudication is a difficult and recurring problem in the field of administrative law." *Retail, Wholesale & Department Store Union v. NLRB*, 466 F.2d 380, 388 (D.C. Cir.1972). In resolving this problem a court must balance the desirable effects of application of the new rule against the possible unfairness sustained by the litigant. *See SEC v. Chenery Corp.*, 332 U.S. 194, 203, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947). In particular, this court has considered the following five factors in deciding whether to give retroactive effect to new rules adopted in agency adjudication:

> (1) whether the particular case is one of first impression, (2) whether the new rule represents an abrupt departure from well established practice or merely attempts to fill a void in an unsettled area of law, (3) the extent to which the party against whom the new rule is applied relied on the former rule, (4) the degree of the burden which a retroactive order imposes on a party, and (5) the statutory interest in applying a new rule despite the reliance of a party on the old standard.

*New York Telephone Co. v. FCC*, 631 F.2d 1059, 1068 (2d Cir.1980) (quoting *Retail, Wholesale & Department Store Union, supra*, 466 F.2d at 390). Taken together, these factors justify the Board's conclusion to apply *Gulton* retroactively here.

■ While this case is not one of first impression, neither it nor *Gulton* represents an "abrupt departure from well established practice." As our earlier discussion indicated, in the nine years since its decision in *Dairylea* the Board has shown little consistency in dealing with superseniority. *See also Local 900, supra*, 727 F.2d at 1187–89, 1195. Rather than abruptly changing well-settled law, the Board in *Gulton* fashioned a clear-cut rule that resolved the uncertainty created by its earlier decisions.

The Union claims that it relied on the Board's decision in *Limpco* in deciding to enforce the superseniority clause in 1981 and 1982. But the substance of the contract clause in question was negotiated many years before the *Limpco* decision, and, as counsel for the Union conceded at oral argument, the record is devoid of evidence of reliance upon *Limpco* either in subsequent contract renewals or in enforcing the provision in this case. Moreover, given the uncertainty suggested by post-*Limpco* cases such as *American Can Co., supra*, 244 N.L.R.B. at 737, any reliance on *Limpco* would have been at best a calculated risk. Under the circumstances, then, there is nothing to oppose the "statutory interest" in applying the new rule.

Finally, respondents have not shown that the retroactive order in this case will work an inordinate hardship on either of them. The Union apparently stopped enforcing the superseniority clause in September 1982 when the complaint was issued in this case, and we are told that the potential joint financial liability is approximately $30,500 plus interest since September 1982. While this is not a trivial amount, it should be remembered that whatever sum must be paid here will compensate six employees who were laid off, as the Board found, in violation of their rights under the Act.

■ Accordingly, we grant the Board's petition to enforce its order.