**MANCHESTER HEALTH CENTER, INC., d/b/a Crestfield Convalescent Home and Fenwood Manor, Petitioner–Cross–Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent–Cross–Petitioner.**

Nos. 1056, 1057, Dockets 88–4004, 88–4012.

United States Court of Appeals, Second Circuit.

Argued May 17, 1988.

Decided Nov. 8, 1988.

Frederick C. Havard, N.L.R.B., Washington, D.C. (Rosemary M. Collyer, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel, Collis S. Stocking, Supervisory Atty., N.L.R.B., Washington, D.C., of counsel), for respondent-cross-petitioner.

Before MESKILL and WINTER, Circuit Judges, and McCURN, District Judge.*

WINTER, Circuit Judge:

This petition for review and cross-application for enforcement of an order of the National Labor Relations Board raise an apparently unique issue regarding "no-solicitation" rules. That issue arises from a health-care facility's disciplining of employees pursuant to a rule prohibiting the discussion of union matters while employees are either on work time or in patient areas. The unique aspect arises from the fact that the rule was agreed to by the union and the employer as a means of healing the wounds left after a strike that bitterly divided the employees and of avoiding consequent disruption that might affect patient care. A three member panel of the National Labor Relations Board (the "Board") concluded that the rule violated Section 8(a)(1) of the National Labor Relations Act (the "Act"), 29 U.S.C. § 158(a)(1) (1982) by impermissibly interfering with the employee's right to engage in concerted activity under Section 7 of the Act, 29 U.S.C. § 157 (1982). We disagree and hold that where a health-care facility has been involved in a bitter and divisive strike, it may, as a part of a strike settlement, agree with the union to limit discussion of union affairs to nonpatient areas during non-work time. We remand to the Board for reconsideration of the application of the no-union-solicitation rule.

Rolland Castleman, Lessner, Castleman & Falkenstein, Manchester, Conn., for petitioner-cross-respondent.

## BACKGROUND

Petitioner Manchester Health Center, Inc., d/b/a Crestfield Convalescent Home

---

* The Honorable Neal P. McCurn, United States District Judge for the Northern District of New York, sitting by designation.

and Fenwood Manor ("Manchester Health") provides medical and professional care services at a nursing home in Manchester, Connecticut. At pertinent times, it had a rule prohibiting solicitation of all kinds by employees during working time or in patient areas. This rule, however, was neither observed nor enforced. Manchester Health also had a rule prohibiting the discussion of controversial or disruptive matters in the presence of patients. This rule appears either to have been universally observed or, where appropriate, enforced.

In early 1983, New England Health Care Employees Union, District 1199, sought to become the bargaining representative of petitioner's Licensed Practical Nurses and service and maintenance employees. In an election conducted by the Board in September 1983, however, Manchester Health's employees rejected union representation. The union filed a second representation petition limited to the nursing home's service and maintenance employees on October 26, 1984. In a second election, the union won a narrow victory. After rejecting Manchester Health's objections to the election, the Board certified the union on October 1, 1985. Manchester Health then challenged the certification by refusing either to recognize or to negotiate with the union. This action precipitated a strike on October 21, 1985.

A substantial number of employees continued to work during the strike, and bitterness ensued between the strikers and non-strikers, each alleging acts of violence, physical threats and other forms of intimidation by the other. This strike lasted for 107 days, until February 5, 1986. As part of the understanding ending the strike, Manchester Health and the union agreed to limit discussions of union affairs by the employees. They believed that continuation of the enmity generated by the strike would benefit no one and that such a limitation would facilitate a healing process as well as avoid a disruptive impact upon patients. Pursuant to this agreement, the following rule was announced at a meeting of the employees on February 5, 1986:

There will be no solicitation or talk of union activities in patient area or on work time, only on breaks or lunch time —if found doing so there will be an immediate warning given.

The reference to "immediate warning" was derived from the progressive disciplinary schedule in Manchester Health's employee manual that stated:

A warning system has been implemented. Supervisors are responsible for issuing warnings to employees. Such warnings are then to be documented and submitted to the Administrator to become a permanent part of the employee's file. One verbal and two written warnings constitute grounds for termination, at the discretion of the administrator.

Later in the day on February 5, Manchester Health's Nursing Director Alice Plante received a report from Michele Geidel, a nurse's aide, that Carol Chesky, also a nurse's aide, had discussed union activities with patients Russell Rice and Thelma MacLaughlin. According to Geidel, Chesky had entered Rice's room during both breakfast and lunch and on each occasion talked to him "about the activities that went on while [the workers] were on strike: How much they or she got paid, and how the weather wasn't bad, and the gab sessions they had." Geidel also asserted that Chesky had visited and mentioned union affairs to MacLaughlin the same day. Plante thereupon called Chesky in for a meeting and confronted her with the accusation that she had been "talking union" to Rice and MacLaughlin. Chesky initially denied the charge but, when shown Geidel's written report, conceded that she had answered inquiries made by the patients concerning the union and the strike. Plante issued Chesky a warning for "[t]alking to patients R. Rice and T. MacLaughlin about union activities."

On February 10, 1986, Chesky received a second warning after an incident with nurse's aide Rosanne Coletto. On February 7, Chesky had raised the issue of the labor dispute while she and Coletto were conversing in the presence of patients in a patient's room. Chesky noted the absence

of either a Christmas bonus or a raise in her paycheck and asserted that the denial of such benefits was a result of her participation in the strike. When Coletto attempted to change the subject by alluding to the fact that someone had already been issued a warning for discussing the union, Chesky noted that it was she who had received the warning and disclosed the details of the incident. Coletto and Chesky then exchanged conflicting views on the merits of the strike, and each objected to the property damage allegedly perpetrated by the other's faction. Finally, Coletto expressed her displeasure with the union and ended the conversation. Warnings were issued to both Chesky and Coletto as a result of this exchange.

On March 6, 1986, Plante received two additional reports of violations of the no-union-solicitation rule by Chesky. Laurine Gedraitis, a nurse's aide who had been a non-striker and a victim of vandalism, complained that at approximately 1:00 a.m. that morning Chesky interrupted Gedraitis's performance of her employment responsibilities to inform Gedraitis of an upcoming union meeting. Although Gedraitis ignored Chesky, Chesky continued to talk about the union situation, announcing that Manchester Health was "stupid" in its dealings with the union. Gedraitis concluded the incident by leaving the room.

Later that same morning, Martha Chatto, a nurse's aide, entered a patient's room to retrieve some equipment. Chesky, who was in the room and giving the patient a bath, told Chatto of the impending union meeting. Chatto replied with a brief grunt and left the room. Chatto subsequently informed Plante of the incident.

Plante informed Manchester Health's Administrator Gary Speiker that Chesky was the subject of two additional complaints concerning the no-union-solicitation rule. When Spieker asked Plante what should be done, Plante recommended termination pursuant to the progressive disciplinary schedule. After Spieker asked Chesky to sign a prepared termination notice, Chesky refused to execute the notice and vowed "to fight [it]." Plante then drew up

two notices pursuant to the disciplinary schedule. The first, a second written warning, stated: "[s]oliciting union activities to staff members during working hours, in patient areas 3/5/86." The second, a termination notice, read exactly the same except that the date was "3/6/86."

Another report on March 6 concerned Suzanne Starling, a nurse's aide. Starling was interrupted in the performance of her duties by a lifelong friend, who requested the location of a patient's room. During the brief interaction that ensued, the visitor inquired as to how things were going for Starling. Starling replied by stating, "you know, the union is in now." Spieker overheard this exchange, pulled Starling aside, and informed her that such conduct was unacceptable. Spieker informed Plante of the incident, who, in turn, issued Starling a warning.

The union thereafter protested the disciplining of Starling and the disciplining and discharge of Chesky. It also filed an unfair labor practice charge alleging, *inter alia*, discriminatory disciplining of Starling and Chesky. The General Counsel issued a complaint, and, after an evidentiary hearing, the ALJ found, *inter alia*, that: (i) the no-union-solicitation rule announced by Plante on February 5, 1986 constituted a new rule, independent of the preexisting, broad no-solicitation rule that had never been enforced; (ii) the no-union-solicitation rule was unlawful; (iii) the disciplinary actions resulting from Chesky's conversations with Coletto on February 10 and Chatto on March 6 were lawful applications of petitioner's preexisting rule prohibiting the discussion of controversial topics in the presence of patients; (iv) the warnings issued to Chesky on February 5 and to Starling on March 6 were unlawful; and (v) Chesky's discharge was unlawful because it was based in part on the unlawful warning.

On review, a three member panel of the Board affirmed the ALJ's conclusion that petitioner's no-union-solicitation rule violated the Act. The panel reasoned, however, that any application of an unlawful rule is itself *per se* illegal, and therefore conclud-

ed that each of the five contested enforcements of the no-union-solicitation rule violated the Act.

## DISCUSSION [1]

Much of the ALJ's opinion concerns the earlier, broad no-solicitation rule promulgated by Manchester Health but never enforced. We agree with the ALJ's conclusion that this rule is essentially irrelevant because the actions regarding Chesky and Starling were based instead on the February 5, 1986 rule agreed to by Manchester Health and the union that expressly prohibited "solicitation or talk of union activities in patient area or on work time." Nevertheless, the burden of the ALJ's analysis had to do with the lawfulness of the earlier, broad rule and focused only briefly on the lawfulness of the later rule that provided the basis for the disciplinary actions in question. With regard to the no-union-solicitation rule, the ALJ reasoned only that a rule prohibiting discussion of union affairs was discriminatorily invalid because it failed to prohibit all non-work-related casual or social conversation during work time.

The right to discuss union affairs on an employer's premises is not absolute and may be restricted where it is outweighed by other interests. *NLRB v. Babcock & Wilcox Co.*, 351 U.S. 105, 76 S.Ct. 679, 100 L.Ed. 975 (1956). We believe that the purpose of healing wounds after a bitter strike and insulating patients from the resultant controversy are such interests and justify restrictions on the rights of employees to discuss union activities. Among the stated purposes of the Act are bringing about labor peace and enhancing productivity by encouraging management and labor to work together to address mutual problems and to resolve their differences. 29 U.S.C. § 151 (1982). Absent some contrary explicit statutory provision, it cannot be rationally argued that legislation with such purposes absolutely bars a union and employer from agreeing on reasonable restrictions on employee conduct that would tend to exacerbate residual bitterness after a strike and to involve nursing home patients in the controversy. Neither the union, the employer, nor the employees generally, much less the patients at Manchester Health, stood to gain from the perpetuation of the emotional conflict dividing the employees. The question therefore is whether the rule at issue was a reasonable, non-discriminatory time and place restriction on the discussion of union affairs. We conclude that it was.[2]

First, there was no competing labor organization on the scene, and no claim can be made that the rule was intended to prevent solicitation by a competing union.

Second, the rule was not discriminatory. It applied to, and was enforced against, both strikers and non-strikers. Chatto, a non-striker, thus also received a warning for her encounter with Chesky. Moreover, Manchester Health also maintained a rule that prohibited the discussion of controversial matters in the presence of patients. Union-related discussions were thus not singled out among the range of subjects with a comparable disruptive effect. In this context, the fact that all non-work-related casual or social conversation was not prohibited was of no consequence whatsoever. The rule here was part of a strike settlement agreement between an employer and a union intended to create a cooling-off period to help reconcile strikers and non-strikers. Relations between the factions were acrimonious, each claiming to have been subjected to intimidation and acts of violence. Non-controversial, non-work-related casual or social conversation has no potential for perpetuation or exacerbation of that acrimony. It simply flies in the face of common sense to argue, as did the ALJ, that a rule seeking to bring about a healing by limiting potentially explosive exchanges between employees must as a matter of law also prohibit all non-work-related casual or social conversation.

---

1. We have examined Manchester Health's procedural objections to the Board's decision and reject them as meritless.

2. Because the events at issue took place in the immediate post-strike period, no issue as to the permissible duration of such a rule is before us.

Moreover, in holding the rule discriminatorily invalid, the ALJ and the Board gave no weight to the fact that the union agreed to it. In doing so, they misread *NLRB v. Magnavox Company of Tennessee*, 415 U.S. 322, 325, 94 S.Ct. 1099, 1102, 39 L.Ed. 2d 358 (1974), to hold that a union may never waive the rights of employees to engage in union solicitation. *Magnavox* held, however, only that such a waiver was invalid absent any "consideration[ ] [relating to] production or discipline," *id.* at 324–25, 94 S.Ct. at 1102, and where the no-solicitation rule applied to non-working time. The present case is distinguishable on both counts because the rule here was expressly intended to achieve conditions conducive to labor peace and adequate patient care and did not apply to solicitation during non-working time. The fact that the union agreed to the rule in the instant case is important in that such agreement confirms the need to restrict both union adherents and dissenters from embarking on conversations with a potential for aggravating existing tensions. As bargaining representative, the union had the responsibility for charting a course that would normalize relations with this employer. Agreeing to rules that limited conversations with such an obvious potential for acrimony can hardly be deemed irrational or oppressive.

■ Third, solicitation during non-working time in nonpatient areas was unrestricted. It is the general rule that "a rule against employee solicitation during the work time is presumptively valid...." *Eastern Maine Medical Center v. NLRB*, 658 F.2d 1, 4 (1st Cir.1981). Moreover, in *St. John's Hospital and School of Nursing, Inc.*, 222 N.L.R.B. 1150 (1976), *enforced in part and denied in part*, 557 F.2d 1368 (10th Cir.1977), the Board recognized that a health care institution's interest in maintaining a "tranquil atmosphere" constitutes a special circumstance justifying greater employer control over potentially disruptive employee conduct. Consequently, the Board, with the approval of the Supreme Court, has adopted a more relaxed version of the above test to evaluate no-solicitation rules promulgated by health care institutions. *Beth Israel Hos-*

*pital v. NLRB*, 437 U.S. 483, 500–05, 98 S.Ct. 2463, 2473–76, 57 L.Ed.2d 370 (1978); *see also NLRB v. Baptist Hospital, Inc.*, 442 U.S. 773, 778–79, 99 S.Ct. 2598, 2601–02, 61 L.Ed.2d 251 (1979). Indeed, the only distinction between the no-union-solicitation rule upheld in *St. John's Hospital* and the rule before us is that the former applied to all forms of solicitation and not, as does the rule before us, merely to union-related ones. Because, for reasons stated, the rule before us is not unlawfully discriminatory, that fact does not undermine the validity of the rule.

As stated, the purpose of the restriction is to minimize potentially volatile encounters between strikers and non-strikers. Such encounters are more likely and more disruptive during work time when employees have tasks to perform that put them in proximity to other employees whom they might want to avoid. Solicitation is not restricted during non-working time, when employees are better able to avoid such unwanted encounters. We therefore believe that the rule is an "[a]ccommodation between [employee rights to discuss union-employer affairs and the need to avoid volatile and polarizing encounters between strikers and non-strikers] with as little destruction of one as is consistent with the maintenance of the other." *NLRB v. Babcock & Wilcox Co.*, 351 U.S. 105, 112, 76 S.Ct. 679, 684, 100 L.Ed. 975 (1956). We do not mean to suggest that an employer may unilaterally impose such a rule. That issue is not before us because the rule here was specifically agreed to by the union. Nor do we need reach the question of under what circumstances a union may withdraw its agreement since the withdrawal in the present case occurred after the discharge of Chesky and the disciplining of Starling.

Although we uphold the rule, we must remand for reconsideration of its application. The ALJ specifically found that Chesky's encounters with Coletto, Gedraitis and Chatto involved deliberate attempts to raise union-employer issues with co-workers who did not support the union. Indeed, in an interview with a newspaper reporter after her discharge, Chesky, in the words

**56**

of the ALJ, "admitted she believed she had a right to solicit union support, even in front of patients, and that she found it impossible not to solicit union support when working." Although the ALJ concluded that the incidents in question therefore violated Manchester Health's rule against raising controversial issues in front of patients—his finding that the no-union-solicitation rule was invalid rendered it irrelevant to his decision—it is also clear that these incidents violated the no-union-solicitation rule. Chesky thus violated the rule three times.

Whether Chesky had the requisite number of warnings, however, is less clear, because the Gedraitis and Chatto incidents were so close in time that the warning for the former and the termination for the latter occurred simultaneously. If the Rice and MacLaughlin incidents were also violations of the rule at issue, then the warning given for those incidents is valid, and Chesky's discharge was lawful. The ALJ's decision is less than clear on this point. In his discussion, he described the incidents as a "perceived breach" of the unlawful rule and found that they did not violate Manchester Health's rules against disruptive conduct in front of patients. Clarification is necessary. If the February 5 warning to Chesky was a valid enforcement of the no-union-solicitation rule, her discharge was proper. If the warning was not a valid application of the rule, then her discharge was invalid because she had only two warnings. We therefore remand for a finding on whether Chesky was properly discharged under the rule. For similar reasons, we remand for reconsideration of the warning to Starling.